No. 69,942

CAROL J. DICKENS, *Appellant,* v. SNODGRASS, DUNLAP & COMPANY, Certified Public Accountants, a Partnership; THE CITY OF FREDONIA, KANSAS, a Municipal Corporation; and LARRY MARSHALL, Individually, *Appellees.*

(872 P.2d 252)

Opinion filed April 15, 1994.

*Richard G. Tucker*, of Law Office of Richard G. Tucker, of Parsons, argued the cause and was on the brief for appellant.

*Charles E. Millsap*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause and was on the brief for appellees City of Fredonia and Larry Marshall.

*Catherine A. Walter*, of Wright, Henson, Somers, Sebelius, Clark & Baker, of Topeka, argued the cause, and *Thomas E. Wright*, of the same firm, was with her on the brief for appellee Snodgrass, Dunlap & Company.

The opinion of the court was delivered by

MCFARLAND, J.: In this action, Carol J. Dickens seeks damages on a wide variety of legal theories for the termination of her employment. The trial court entered summary judgment in favor of all defendants, and Ms. Dickens appeals therefrom.

In January 1987, Carol Dickens was hired by the accounting firm of Snodgrass, Dunlap & Company to work as a junior accountant. The firm has offices in Fredonia, Iola, Garnett, and

Yates Center. Ms. Dickens worked at all times herein at the Fredonia office. Partner Joseph M. Bambick managed the Fredonia office. The terms of Ms. Dickens' employment were set forth in a written contract. The pertinent provisions thereof are as follows:

"Both parties hereby agree that this contract shall continue for one (1) year from the date executed, and from year to year thereafter, it also being understood that the term of employment may be terminated by either party at the end of any month during the first or any succeeding year giving to the other party adequate oral or written notice. Adequate notice shall be defined as notice of one (1) calendar week during the first six (6) months of the contract and two (2) calendar weeks thereafter."

Ms. Dickens' employment was terminated on April 25, 1991.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. To defeat a properly supported motion for summary judgment, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial. *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, Syl. ¶ 1, 863 P.2d 355 (1992). The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 306, 756 P.2d 416 (1988).

The first two issues concern the propriety of the entry of summary judgment in favor of Larry Marshall and the City of Fredonia. These issues arise from an incident involving Ms. Dickens' husband, Dean Dickens. The pertinent facts are as follows. At approximately 4:00 a.m. on the morning of November 7, 1990, Dean was stopped by a Fredonia policeman who suspected a DUI violation. At first, Dean refused to take a breathalizer test but then took the test, passed it, and went on his way. He was angry over this incident and sent a letter of complaint to Fredonia's

mayor, Larry Marshall, and the Fredonia newspaper on or about November 19, 1990. The trial court's findings relative to what transpired thereafter are as follows:

"24. When Dean Dickens did not hear from Larry Marshall in response to his first letter, Dean Dickens wrote a second letter. He sent this second letter to the Fredonia newspaper on or about December 6, 1990. Both letters were published in the newspaper. In Mr. Dickens' letter he:

Suggested that the taxes he paid were more than sufficient to pay the wages of the police officer who had stopped him;

Requested information about the police officer, along with the names and phone numbers of the city council members;

Suggested that the city get rid of officers who 'harass' the public, or train them better;

Suggested that perhaps Fredonia was the 'Harassment Capital of Kansas';

Called the police department rebuttal printed in the newspaper 'phony';

Stated that he knew that the city police department and the newspaper were involved in some type of collusion, and suggested that the mayor might also be involved;

Suggested that there should perhaps be an investigation of city officials in Fredonia.

"25. Larry Marshall has been the mayor of the City of Fredonia since 1988. After reading Dean Dickens' first letter, Mayor Marshall conducted an investigation, obtained a written report from the police department, and found no fault with the city officers and their treatment of Mr. Dickens.

"26. The Accounting Firm has done the annual audit for the City of Fredonia for several years, and Carol Dickens did the field work on those audits during the years 1987-1990. During the field audit process, staff from the Accounting Firm go to the city's offices and examine and audit the city's books and records.

"27. Around the time of Dean Dickens' letters, Mayor Marshall was told by the city clerk that Carol Dickens, the junior accountant from the Accounting Firm who in years past had done the field work on the city audit, was the wife of Dean Dickens, the man who had written the letters about the City of Fredonia.

"28. When he learned that Dean Dickens' wife performed field audit work at the city building, Mayor Marshall was concerned 'that the individual that is working on the audit has access to the innermost records of the city and I would be concerned with anyone who has that type of access as to what their attitudes are towards the city, what their feelings are.'

"29. In December, 1990, close to the time Dean Dickens had written his letters, Larry Marshall had a phone conversation with Joe Bambick, the manager

168

of the Fredonia office of the Accounting Firm. Mayor Marshall commented to Mr. Bambick that he 'had a concern as to whether or not Mrs. Dickens might harbor the same feelings that Mr. Dickens did.' All that Joe Bambick can recall thinking from the telephone conversation is that Larry Marshall was concerned about Carol Dickens working on the city audit.

"30. The December, 1990, telephone comment by Mayor Marshall to Joe Bambick is the only comment ever made by Marshall or anyone from the City of Fredonia regarding Carol Dickens or the city audit.

"31. Regarding Mayor Marshall's comment to Carol Dickens' employer, he did not tell anyone from the Accounting Firm that it would lose the city audit if Carol Dickens was not removed from the audit, and he never suggested or inferred that Carol Dickens should be fired from her employment with the Accounting Firm.

"32. When Joe Bambick heard Mayor Marshall's December, 1990, comment about whether Carol Dickens' feelings towards the city might be the same as her husband, Bambick took this to be a request that Carol not work on the city audit. For the purpose of this summary judgment, the Court gives plaintiff the benefit of an inference that Larry Marshall intended such an interpretation by the Accounting Firm.

"33. The Accounting Firm decided to have someone else do the Fredonia audit in 1991. There was other work for Carol Dickens to do, and she was going to be assigned to other audit work.

"34. In the accounting business, it is not uncommon for a client to express concern over the particular accountant selected to do work. There had been other occasions with the Accounting Firm where an accountant was removed from a particular assignment because of a client comment. This does not result in the accountant being fired.

"35. Carol Dickens' removal from the Fredonia audit did not require her termination with the Accounting Firm."

Ms. Dickens contends that the telephone call from Mayor Marshall to Bambick constituted a tortious interference with her contract of employment which contributed to her termination. Her first claim of error is that the district court improperly entered summary judgment in favor of Marshall and the City of Fredonia on this cause of action.

Kansas has long recognized that a party who, without justification, induces or causes a breach of contract will be answerable for damages caused thereby. *Turner v. Halliburton Co.*, 240 Kan. 1, Syl ¶ 7, 722 P.2d 1106 (1986).

45 Am. Jur. 2d, Interference § 39, p. 314, states: The elements essential to recovery for tortious interference with a contract are:

(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom."

The uncontroverted facts herein fall so far short, in so many respects, of supporting a cause of action based upon tortious interference with a contract that it makes meaningful discussion of the issue difficult. We will, therefore, base our resolution of the issue on just one of its aspects.

Tortious interference with a contract is predicated on malicious conduct by the defendant. *Turner v. Halliburton Co.*, 240 Kan. at 12.

Dean Dickens publicly accused the City of Fredonia of wrongdoing. He suggested the mayor was in collusion in the wrongdoing and that there should be an investigation of the city officials of Fredonia. The mayor then learned that the woman who has previously done the field work for the annual audit of the City's financial records is the wife of Dean Dickens. Another audit was to be performed. It was reasonable for the mayor to have some concern as to whether the woman who would likely be doing the audit shared her husband's feelings. The audit should be done impersonally and professionally. Even if construed, for purposes of summary judgment, as a request that Ms. Dickens not be assigned to the audit, it was a wholly reasonable and appropriate request in the City's own interest. The City had entered into a contract with Ms. Dickens' employers to perform the audit. The telephone call related to the performance of the City's contract. There is no evidence the telephone call was malicious or intended to interfere with plaintiff's contract.

It would be difficult to elevate the telephone call to an "interference," but even if this is done, it is not a tortious interference as the call was justified.

In *Turner v. Halliburton Co.*, 240 Kan. at 12-13, we stated:

"It is recognized that not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations. *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 424-25, 370 P.2d 390 (1962). See also Restatement (Second) of Torts § 767. In 45 Am. Jur. 2d, Interference § 27 it is stated:

'Justification is the most common affirmative defense to an action for interference. The term "justification" has been said not to be susceptible of any precise definition. It is employed to denote the presence of exceptional circumstances which show that no tort has been in fact committed and to connote lawful excuse which excludes actual or legal malice. It has been suggested that, rather than to express this defense to interference in terms of justification, it might be more accurately stated to be a matter of privilege; that is, the defendant may show that interference, although it occurred, is privileged by reason of the interests furthered by his conduct. Whichever word is used, the defense comes into play only after interference has occurred, as shown by judicial statements that interference is actionable only if without justification or, alternately, that interference which is justifiable is not actionable, and that one is not liable in damages even though his acts and conduct constitute interference with contractual rights of another if he employs fair means and acts in good faith and with justification.

'The law has crystallized relatively few concrete rules to determine the existence or want of justification or privilege in connection with the tort of interference. The issue raised on a plea of justification has been said to depend on the circumstances of the particular case, bearing in mind such factors as the nature of the interferer's conduct, the character of the expectancy with which the conduct interfered, the relationship between the various parties, the interest sought to be advanced by the interferer, and the social desirability of protecting the expectancy or the interferer's freedom of action. Generally, a circumstance is effective as a justification if the defendant acts in the exercise of a right equal or superior to that of the plaintiff, or in the pursuit of some lawful interest or purpose, but only if the right is as broad as the act and covers not only the motive and purpose but also the means used.' pp. 304-05."

We find no error in the trial court's entry of summary judgment in favor of Larry Marshall and the City of Fredonia on Ms. Dickens' claim of tortious interference.

For her next issue, Ms. Dickens contends the trial court erred in entering summary judgment in favor of Marshall and the City of Fredonia on her claims made under 42 U.S.C. § 1983 (1988). The federal statute provides:

"Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress."

Plaintiff's § 1983 claims are predicated on the same telephone conversation discussed in the first issue. The trial court's analysis is as follows:

"10. Two of the essential elements which plaintiff would bear the burden of proving at trial on her claim for a civil rights violation claim under 42 U.S.C. § 1983 would be:

a. That the City of Fredonia and Larry Marshall acted so as to deprive Carol Dickens of a right secured by the Constitution or laws of the United States (here she claims that those rights were (1) a property interest in her implied contract for continuing employment with the Accounting Firm, and (2) her First Amendment right to free speech); and

b. That defendants deprived her of these rights under the color of any ordinance, regulation, custom or usage of any State or Territory.

"11. In regard to Carol Dickens' § 1983 claim, there is no evidence that she was in any way deprived of her constitutional right to free speech. The letters written by her husband were his words and thoughts, not hers. It was Dean Dickens, not Carol Dickens, who was exercising his First Amendment rights in publishing the letters about the City of Fredonia and its police department. The right to bring an action under § 1983 is personal in nature and does not accrue to a relative. One person may not sue, nor recover damages, for the alleged deprivation of another person's civil rights. *Dohaish v. Tooley*, 670 F.2d 934 (10th Cir.), *cert. den.* 459 U.S. 826, 103 S.Ct. 60, 74 L. Ed. 2d 63 (1982); *Rodriguez Otero v. Riefkohl*, 667 F. Supp. 58 (D. Puerto Rico 1987).

. . . .

"13. In regard to Carol Dickens' § 1983 action as based upon her loss of employment, there is no 'property interest' sufficient to support such a civil rights claim in employment which can be terminated at the will of the employer. *Harris v. Board of Public Utilities of Kansas City*, 757 F. Supp. 1185 (D. Kan. 1991)."

In *Harris v. Board of Public Utilities of Kansas City*, 757 F. Supp. 1185 (D. Kan. 1991), relied on by the trial court, plaintiff, Director of Human Resources for the Board of Public Utilities of Kansas City, brought a civil rights and employment discrimination action against his employer following his termination. He was an at-will employee. He raised, *inter alia*, a 42 U.S.C. § 1983 claim, contending his termination violated his procedural due process rights which apply, under the Fourteenth Amendment to the United States Constitution, when a constitutionally protected property interest is at stake. 757 F. Supp. at 1188-89.

The court rejected Harris' assertion that he had a protected interest in his continued employment. The court reasoned:

"An interest in property arises only when there is a legitimate claim of entitlement to it; merely to have an abstract need or desire for the particular benefit or a unilateral expectation of it is insufficient to create a property interest. *Roth*,

408 U.S. at 577, 92 S. Ct. at 2709. Property interests are not created by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S. Ct. 2694, 2699, 33 L. Ed. 2d 570 (1972); *Richardson v. City of Albuquerque*, 857 F.2d 727, 731 (10th Cir. 1988). The existence of such 'rules or mutually explicit understandings' are, of course, determined by reference to state law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S. Ct. 2074, 2077, 48 L. Ed. 2d 684 (1976). We must, therefore, decide whether the Kansas Supreme Court would find a property interest under the facts of this case. *Graham v. City of Oklahoma City*, 859 F.2d 142, 146 (10th Cir. 1988).

"Kansas follows the general rule that, in the absence of a contract covering the duration of employment, the employment is terminable at the will of either party. *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 54-55, 551 P.2d 779 (1976). An 'at-will' employee has no property interest in employment. *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988)." 757 F. Supp. at 1190.

The trial court correctly held that a § 1983 action is personal in nature and cannot be asserted vicariously for the denial of some other person's civil rights. However, in this case, even if the "speech" had been that of declarant, the action still would be improper. Let us assume that plaintiff had walked into the city offices prepared to commence the audit and stated that it was high time someone checked the books as the city officials were all crooks. If the mayor had then called the firm and demanded someone else be sent over to perform the audit, he would certainly have had the right to do so. Inherent in the City's contract with the accounting firm is the City's right of legitimate inquiry as to anything that might jeopardize or interfere with the performance of the contract. Whether the telephone call herein was only an inquiry as to whether or not plaintiff shared her husband's views or was a request that someone else perform the audit, it is still an inadequate basis on which to ground a § 1983 action.

We adopt the rationale of the trial court herein and find no error in the trial court's entry of summary judgment against the plaintiff on her § 1983 claim.

We turn now to the issues raised concerning the propriety of the entry of summary judgment in favor of the defendant accounting firm.

For her first issue as to this defendant, plaintiff contends that the trial court erred in finding that there was not an implied con-

tract of continuing employment over and above the written contract. The trial court's specific findings and statements of applicable law relative thereto are as follows:

"1. Under Kansas law, an implied in fact contract establishing the duration of employment must be based upon evidence of an understanding and the intent of the employer and the employee. *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984).

"2. Modification of a written contract requires mutual assent, or a meeting of the minds with respect to the proposed amendment. *Meyer v. Diesel Equipment Co., Inc.*, 1 Kan. App. 2d 574, 577, 570 P.2d 1374 (1977).

"3. An implied contract which modifies a written contract also requires 'fresh and independent' consideration. *Hummel v. Wichita Federal Savings & Loan Assoc.*, 190 Kan. 43, 47, 372 P.2d 67 (1962).

"4. An implied contract for continuing employment is not created by the unilateral expectations of the employee. *Harris v. Board of Public Utilities of Kansas City*, 757 F. Supp. 1185 (D. Kan. 1991).

"5. In the present case there is absolutely no evidence to indicate mutual assent, additional consideration or any action at all on the part of defendant Snodgrass to support plaintiff's claim of an implied contract which supplemented or changed the provisions of the express written contract of employment.

"6. For the above reasons, defendant Snodgrass is entitled to summary judgment in its favor on the issue of breach of implied contract."

Plaintiff does not contend there were any discussions between herself and the firm relative to modification of her employment-at-will status. Her argument in support of an implied contract is along these lines. The contract required her to: (1) render satisfactory services; (2) work full time plus reasonable overtime; (3) refrain from engaging in similar outside work; and (4) not compete with the firm for three years after leaving the firm. The contract further provided:

"(4) IT IS UNDERSTOOD AND AGREED that when and as the abilities demonstrated by the employee shall so warrant, in the judgment of the company, he shall be advanced in position and duties to a position bearing a higher rate of compensation, notwithstanding the provisions of paragraph (1) hereof. [Note: Paragraph (1) relates solely to compensation.] Any such change in classification or compensation shall not effect the other provisions and restrictions in this agreement."

Plaintiff also relies on the following:

(1) Her attendance at classes, seminars, and workshops to improve her work skills during her employment;

(2) her work performance, which she characterizes as satisfactory;

(3) the lack of being advised in writing as to needed areas of improvement; and

(4) her increased pay and responsibilities during her employment.

Summarized, plaintiff contends that, somehow, her continued employment with pay increases establishes satisfactory performance and created an implied contract of continuing employment over and above the written contract. She relies upon *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987), and *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684 P.2d 1031 (1984). This reliance is misplaced. Neither case involved written contracts of employment establishing the employee's status. In the absence of written contracts, it was necessary to look at all the facts to determine whether there was an implied contract of continuing employment at the time of the commencement of the employment. In *Morriss*, we held:

" 'Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced." 241 Kan. 501, Syl. ¶ 1.

We agree with the trial court's statements of applicable legal principles and its finding relative to the lack of any evidence supporting plaintiff's claim that an implied contract of continuing employment, over and above the written contract specifying plaintiff's employment-at-will status, ever came into existence. The mere fact that an employee has not been previously terminated under written contractual employment-at-will provisions does not create an implied contract for continuing employment.

Plaintiff's next issue is closely allied with the preceding issue. Plaintiff contends that the trial court erred in entering summary

judgment on her claim that the firm breached its duty of good faith and fair dealing towards her. Her position is primarily a rehash of that stated in the previous issue—she was a satisfactory employee who was treated shabbily by the defendant employer.

The trial court's rationale is as follows:

"1. Under Kansas law, there is no cause of action for breach of implied duty of good faith and fair dealing which would entitle the plaintiff to recover either in contract or in tort under this theory against defendant Snodgrass. *Morriss v. Coleman Co.*, 241 Kan. 501, Syl. ¶ 2.

"2. Therefore, defendant Snodgrass is entitled to summary judgment in its favor on this issue."

In *Morriss v. Coleman Co.*, we held:

"The principle of law stated in Restatement (Second) of Contracts § 205 (1979), that every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement, is held to be overly broad and not applicable to employment-at-will contracts." 241 Kan. 501, Syl. ¶ 2.

Plaintiff asks that we reverse this holding in *Morriss* and adopt the rationale of the dissent. This we decline to do. The trial court did not err in entering summary judgment in favor of the defendant employer on this cause of action.

Plaintiff's next issue is that the trial court erred in entering summary judgment on her claim seeking damages based upon her discharge being an unlawful retaliatory discharge for the speech of her husband. This issue brings us back to the telephone call to the accounting firm from Larry Marshall.

Plaintiff contends that this court "must determine this issue by deciding whether or not the right of free speech . . . rises to the level of public policy and whether or not the mention of Larry Marshall's concerns over Dean Dickens' letters to the editor at Carol's firing has a significant connection to a public policy."

Before proceeding further, some additional uncontroverted facts need to be stated in order to better understand the circumstances leading to plaintiff's termination.

It was the policy of the firm to evaluate each employee each year. The first annual evaluation (1987) occurred shortly after plaintiff had become the firm's employee. The evaluation was generally satisfactory, but some concern was expressed as to

plaintiff's ability to organize her workload. The 1988 evaluation criticized leadership, judgment, administrative ability, and work organizational skills. The 1989 evaluation stated a number of deficiencies. The 1990 evaluation showed a marked decline in performance. In three categories she was ranked satisfactory. In four other categories, she was ranked "below satisfactory standards." In no category was she rated "outstanding" or "strong." The words "erratic, undisciplined, unreliable, inconsistent, hasty, sloppy, weak, amateur, rash, and lagging" appear. Plaintiff was now a Certified Public Accountant. There was an ongoing conflict between plaintiff and a secretary named "Sandy." The evaluator felt that probably either plaintiff or Sandy would leave. Plaintiff's attitude was described as arrogant and stubborn, with an inability to take criticism well, and she was criticized for her use of profanity. It was noted that while it was difficult to recruit qualified personnel for the Fredonia office, an effort should be made to find someone to replace plaintiff. All of these evaluations occurred prior to Dean Dickens being stopped by the police and his letter writing activities.

The telephone call from the mayor to the firm occurred in December 1990. In November 1990 at a meeting of the firm's partners, plaintiff's job performance was discussed and there was a consensus that plaintiff would probably have to be terminated but such action should be delayed until after the tax season. On April 24, 1991, the firm's partners and the administrative staff met. Plaintiff expressed strong criticism of the secretary, Sandy. After the meeting, plaintiff was told she would not be assigned the Fredonia audit. Later yet that day, the partners conferred and decided to terminate plaintiff. The next day, plaintiff was advised she was being terminated. Reasons stated included her attitude of superiority, arrogance, difficulty in accepting criticism, use of profanity, and too many mistakes in her work.

An employee-at-will is just that. He or she may be terminated without cause. The only exceptions thereto arise from public policy. An employee-at-will may not be terminated in retaliation for: having filed a workers compensation claim, *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981), or for "whistle-

blowing," *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988). For purposes of a review of the summary judgment, we will assume the telephone call from the mayor was a contributing factor in plaintiff's termination.

Are the facts herein such as would add this situation to the previously recognized exceptions to the law relative to the termination of employees-at-will? To do so we would have to determine that some strong public policy required it. As we said in *Palmer v. Brown*, 242 Kan. at 897:

"Before courts are justified in declaring the existence of public policy, however, 'it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt.' " (Quoting *Noel v. Menninger Foundation*, 175 Kan. 751, Syl. ¶ 4, 267 P.2d 934 [1954].)

If a speech exception is to be recognized, there is the immediate problem that the "speech" herein was not that of plaintiff, but of a relative. If that is sufficient, then what degree of kinship is necessary to be within the protected area? Are friends of the speaker also protected? If so, how close must the association be?

The most analogous Kansas case to the one herein, and it is not close, is *Cain v. Kansas Corporation Commission*, 9 Kan. App. 2d 100, 673 P.2d 451 (1983), *rev. denied* 235 Kan. 1041 (1984). Cain, a securities examiner for the defendant, sought to establish a cause of action for retaliatory discharge based upon his outspoken advocacy for consumers and investors. In refusing to so extend a claim based upon retaliatory discharge, the court stated:

"Clearly, how best to enforce the Kansas securities act is a matter within the agency's discretion. Appellant has not alleged that agency policy toward consumers and investors was fraudulent, arbitrary or beyond its statutory authority. He has based his claim on his personal opinion as to how the agency should exercise its discretion. His personal opinion on how KCC should carry out the statutory purposes of the securities act is not public policy. No public policy was shown to have been contravened by the discharge. The trial court correctly concluded that appellant had failed to state a claim for relief for retaliatory discharge." 9 Kan. App. 2d at 104-05.

Viewing the facts in the light most favorable to the plaintiff, we find no public policy has been shown herein to have been contravened by plaintiff's discharge. Therefore, we must conclude

that the trial court was correct in entering summary judgment in favor of the defendant employer on plaintiff's claim for relief based upon retaliatory discharge.

The final two issues concern the trial court's rulings as to plaintiff's amended petition seeking damages based on disparate pay.

The pertinent procedural background is as follows. On September 24, 1991, the original petition was filed seeking damages for plaintiff's April 25, 1991, termination. Extensive discovery was had. On May 27, 1992, both motions for summary judgment were argued (1. Snodgrass Dunlap & Company, and 2. Larry Marshall and City of Fredonia). On the same day, plaintiff filed a pretrial questionnaire stating, *inter alia*: (1) no further discovery was contemplated; and (2) she wished to amend the petition to allege a new claim that her termination violated her civil rights as it was the result of unlawful sex discrimination. The journal entry granting summary judgment to the defendants Marshall and City of Fredonia was filed on June 23, 1992. The journal entry granting summary judgment to the defendant firm was filed on September 22, 1992. A few days earlier (September 16, 1992), plaintiff had filed a motion to amend her petition to add a claim under the Equal Pay Act of 1963 (29 U.S.C. § 206[d] [1988]) seeking to recover alleged underpayment of wages during her employment. The motion was heard on October 21, 1992. On November 13, 1992, the motion was granted with the hearing date (October 21, 1992) to be deemed the filing date of the amended petition. The petition could only be amended with leave of the court (K.S.A. 60-215[a]). On May 4, 1993, the trial court entered summary judgment in favor of the defendant firm. On the disparate pay claim, pertinent aspects thereof are: (1) plaintiff's stipulation that she was not alleging unequal pay for any period after September 1990; (2) the two-year statute of limitations set forth in 29 U.S.C. § 255(a) (1988) applied; and (3) the relation-back provisions of K.S.A. 60-215(c) did not apply.

For her first claim of error in this area, plaintiff contends the trial court erred in holding that the amended claim did not relate back to the date of filing of the petition under K.S.A. 60-215(c), which provides, in pertinent part:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Did the trial court err in holding that the amended claim did not relate back to the date of the filing of the original petition? We believe not.

The petition, with its large array of claims, alleged only wrongful termination and sought damages for such termination. At the time of the May 27, 1992, hearing on the summary judgment motion, no further discovery was contemplated and plaintiff suggested only the possibility that another claim might be filed on the ground that her *termination* was the result of sex discrimination. A few days before summary judgment was granted to the firm on the original petition (September 22, 1992), the plaintiff filed a motion to add a claim based upon the federal Equal Pay Act. The petition could only be amended with leave of the court. K.S.A. 60-215(a). This was the first time any claim was asserted in this action seeking damages for anything other than the termination. On October 11, 1991, plaintiff had filed a complaint alleging disparate pay with the Kansas Human Rights Commission, but that, of course, was a separate proceeding. After the motion to file an amended petition was granted (November 13, 1992) with the amended petition to have been deemed filed on the date of the hearing on the motion (October 21, 1992), discovery relative to the new claim was attempted as the previously completed discovery did not involve the new claim. The unequal pay claim involves only the period November 1989 through September 1990. Plaintiff's termination occurred April 25, 1991, and the termination itself is the basis for every claim in the original petition.

*Schutz v. Western Pub. Co.*, 609 F. Supp. 888 (N.D. Ill. 1985), is quite analogous to the case herein. In *Schutz,* the plaintiff brought a Title VII action seeking damages for her wrongful termination. Later, plaintiff sought to amend in an Equal Pay Act claim. Applying Fed. R. Civ. Proc. 15(c) (from which our K.S.A. 60-215[c] was taken), the court held:

"Count III of plaintiff's Amended Complaint, in which plaintiff alleges violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), cannot under federal law relate back to the date the original complaint was filed, because the Equal Pay Act claim did not arise out of the conduct, transaction or occurrence set forth in the original pleading. The amendment to the Complaint introduced a new and different cause of action from that outlined in the original Title VII complaint. Moreover, the original complaint did not give defendant such notice of the Equal Pay Act action that defendant would not be prejudiced in maintaining its defense to the action on the merits. The plaintiff's Equal Pay Act claim thus must be deemed to have been filed on May 23, 1984. *See* Fed.R.Civ.P. 15; *Barnes v. Callaghan & Co.*, 559 F.2d 1102, 1106 (7th Cir. 1977)." 609 F. Supp. at 905.

We conclude the trial court correctly held that the amended claim alleging violation of the Equal Pay Act did not arise out of the conduct, transaction, or occurrence set forth in the original petition and, hence, did not relate back to the filing of the original petition. Thus, the filing date of the amended claim is October 21, 1992.

For her second issue as to the propriety of the entry of this summary judgment, plaintiff contends that the trial court erred in holding that the applicable statute of limitations was two years rather than three years. 29 U.S.C. § 255(a) provides that the action "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."

The last date of alleged unequal pay is September 1990. The claim alleging violation of the Equal Pay Act was filed October 21, 1992. Thus, the claim is time barred unless it is held to be a "willful violation" under 29 U.S.C. § 255(a).

The trial court held:

"10. In order to establish a willful violation, there must be evidence that defendant 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA [Fair Labor Standards Act, of which the Equal Pay Act is a part].' *McLaughlin v. Richland Shoe Co.*, 108 S. Ct. 1677 (1988).

"11. In the present case, there is absolutely no evidence that defendant knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA."

*In McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 100 L. Ed. 2d 115, 108 S. Ct. 1677 (1988), the United States Supreme Court was required to construe what was intended to constitute a "willful violation" under 29 U.S.C. § 255(a). The Court held:

"As originally enacted, the 2-year limitations period drew no distinction between willful and nonwillful violations.

"In 1965, the Secretary proposed a number of amendments to expand the coverage of the FLSA, including a proposal to replace the 2-year statute of limitations with a 3-year statute. The proposal was not adopted, but in 1966, for reasons that are not explained in the legislative history, Congress enacted the 3-year exception for willful violations.

"The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations. It is equally obvious to us that the *Jiffy June [Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139 (5th Cir.), *cert. denied* 409 U.S. 948 (1972),] standard of willfulness—a standard that merely requires that an employer knew that the FLSA 'was in the picture'—virtually obliterates any distinction between willful and nonwillful violations. As we said in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. at 128, 'it would be virtually impossible for an employer to show that he was unaware of the Act and its potential applicability.' Under the *Jiffy June* standard, the normal 2-year statute of limitations would seem to apply only to ignorant employers, surely not a state of affairs intended by Congress.

"In common usage the word 'willful' is considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional.' See Roget's International Thesaurus § 622.7, p 479; § 653.9, p 501 (4th ed. 1977). The word 'willful' is widely used in the law, and although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent. The standard of willfulness that was adopted in Thurston— that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute—is surely a fair reading of the plain language of the Act." 486 U.S. at 132-33.

The plaintiff argues that a "willful violation" is shown by virtue of the nature of the defendant firm's business. She states:

"The plaintiff, Carol Dickens, is a practicing CPA who provides advice to her clients on payroll matters. Advising clients on payroll matters involves advising them of the applicability of State and Federal wage laws. In order to advise

clients on payroll matters, an accountant must know whether State or Federal wage laws apply to their clients' situations when advising them on payroll matters. The Defendant, Snodgrass, Dunlap & Company is a partnership providing accounting services to its clients which would include advising them on payroll matters. Because the partners of Snodgrass, Dunlap & Company are CPAs who advise their clients on payroll matters, they would have had to have had knowledge of the applicability of Federal wage laws to their own business."

Under this argument, a firm of CPAs would automatically be subject to the three-year statute of limitations as any violation of the Act would be "willful." This presupposes that a firm of CPAs cannot be negligent in operating its internal business. Plaintiff's claim of a "willful violation" rests wholly on the fact the firm's partners are CPAs and provide accounting services. Interestingly, plaintiff is also a CPA and, under her test, charged with the knowledge of the Equal Pay Act. There is no evidence that she brought this matter to her employer's attention. Had she done so and the employer had ignored the matter, this would have been evidence of a willful violation. For purposes of appellate review of this issue, we are assuming plaintiff's allegations as to unequal pay are true. We find no error in the trial court's determination that the two-year statute of limitations was applicable and that, accordingly, the amended claim was barred.

The trial court is to be commended for its capable handling of the many issues raised herein.

The judgment is affirmed.