**Azmina WEATHERBY, Plaintiff,**

v.

**The BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Defendant.**

**Case No. 01–2357–JPO.**

United States District Court, D. Kansas.

June 11, 2002.

Anthony J. Kotich, John L. Yeary, Jr., Topeka, KS, for Plaintiff.

David R. Cooper, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Defendant.

## MEMORANDUM & ORDER

O'HARA, United States Magistrate Judge.

### I. Introduction.

This is a contract case in which the plaintiff, Azmina Weatherby, asserts claims against her former employer, defendant The Burlington Northern & Santa Fe Railway Co. (BNSF). In August of 1999, plaintiff gave up her train "crew planner" job with BNSF in Fort Worth, Texas, to move with her husband and take an identical crew planner job with BNSF in Kansas City, Kansas. Plaintiff alleges that BNSF denied her request for relocation benefits despite BNSF's established company policy and practice of paying relocation benefits to those whom she regards as similarly situated salaried employees who were reassigned, relocated, or transferred. Plaintiff contends that BNSF's denial of her relocation benefits breached an implied agreement between the parties. Alternatively, plaintiff contends that recovery is warranted under the equitable doctrine of quantum meruit.

Pursuant to Fed.R.Civ.P. 56(c), BNSF has filed a motion for summary judgment **(doc. 24).** The court has reviewed BNSF's supporting memorandum, plaintiff's response, and BNSF's reply (docs. 25, 26, & 27, respectively), as well as the transcripts of the various depositions referred to in the parties' written submissions. For the reasons explained below, the court finds that the material facts are uncontroverted and that BNSF is entitled to judgment as a matter of law. Thus, BNSF's motion for summary judgment will be granted.

### II. Facts.

The record reflects no significant factual disagreement. Consistent with the well-established standards governing summary judgment (*see* section III below), to the truly nominal extent that the parties see the facts somewhat differently, the facts recited below have been cast in the light most favorable to plaintiff, the non-moving party.

Plaintiff was employed by BNSF from 1994 until 2000. Initially, she worked as a clerk in the vehicle services department. Later, she worked as an operations support clerk and then a dispatcher. Plaintiff moved to Springfield, Missouri, and worked there until that office closed down, at which time BNSF moved all of its Springfield dispatchers, including plaintiff,

to BNSF's headquarters in Fort Worth. Plaintiff remained a dispatcher until 1997 (or nearly 1998) when she applied for and was awarded a job as a crew planner for BNSF trains. Within BNSF, this is a non-union, entry-level management position.

Approximately three years after plaintiff went to work for BNSF, in 1997, she married Steven Weatherby. Mr. Weatherby was employed by BNSF from 1995 to 2000 as an electronics technician. Within BNSF, electronics technicians are unionized, non-management positions. In 1999, Mr. Weatherby had sufficient union seniority to bid on and receive a position that he desired in Kansas City. In June of 1999, Mr. Weatherby moved from Fort Worth to take that job.

Plaintiff informed Warren Connors, the BNSF crew superintendent in Fort Worth who was her immediate supervisor, that Mr. Weatherby had taken this position in Kansas City. Plaintiff asked Mr. Connors to inform her if he heard of any positions opening in the Kansas City area that she might be able to fill, whether as a crew planner or anything else. By an e-mail message dated June 16, 1999, plaintiff notified Mr. Connors:

> Just wanted to let you know that my husband has accepted a job in K.C. and so I am looking to move in that direction. His report date was supposed to be in July, but they have moved it up to June 21. I have to stay behind, at least until the house sells, by then I hope to have something out there. If not, then, . . . . I guess I'll have to cross that bridge if and when the time comes. I certainly don't want to leave the company.
>
> Anyway, if there are jobs in Topeka or K.C. that you know of, I'd appreciate a head's up.

According to plaintiff, in addition to Mr. Connors, she had many people keeping their eyes and ears open for any positions in Kansas City that might be opening. Sometime later, Mr. Connors informed plaintiff that a man named Silver Amos would be vacating one of the crew planner positions in Kansas City, i.e., the same kind of position that plaintiff then held in Fort Worth.

BNSF advertises job openings internally by posting electronic bulletins on its company-wide computer system. With regard to the Kansas City crew planner position that Mr. Amos was vacating, plaintiff does not recall the computerized BNSF bulletin indicating that a relocation package was available as a benefit to applicants for the position. BNSF's job bulletins typically do not include such information.

Before BNSF posted the Kansas City crew planner position, plaintiff spoke to Terry Carlson, the Kansas City crew superintendent (Mr. Connors' counterpart). Plaintiff asked Mr. Carlson if he might have a position opening in his office. Mr. Carlson responded in the affirmative. Plaintiff expressed her interest in applying for the position. Mr. Carlson said: "That's fine." Plaintiff later followed up and applied to Mr. Carlson for the position Mr. Amos vacated.

After plaintiff's first conversation with Mr. Carlson to verify that he had an opening and after she had applied for the Kansas City crew planner position, plaintiff spoke with Mr. Carlson a second time to determine the status of her application. Mr. Carlson told plaintiff that, although he had not yet come to a decision, he knew that she was an experienced crew planner. He told plaintiff that, given the fact that she already was a crew planner and had all of the necessary training and qualifications, it would benefit him to have somebody like her in the Kansas City position. The two also discussed the fact that plaintiff's husband had not received monetary

benefits in connection with his move because his position was a "bid job" in the union. During this discussion, which it is important to bear in mind occurred *before* plaintiff accepted the crew planner job in Kansas City and moved there, Mr. Carlson told plaintiff that he would "check on" a relocation benefit package for her.

*After* plaintiff started work for BNSF in Kansas City in August of 1999, Mr. Carlson merely told plaintiff that he would check again on her request for a relocation package. Plaintiff, however, acknowledges that she *never* received a definitive response from Mr. Carlson, her immediate supervisor in Kansas City, either before or after she moved from Fort Worth.

The eligibility provisions of BNSF's policy entitled "Salaried Employee Relocation Policy Effective February 1, 1997," state:

The BNSF Salaried Employee Relocation Policy is designed to ensure a smooth transition to your new work position. The Policy provides coverage for most travel, living and moving expenses associated with your relocation, as well as assisting with certain federal and state tax liabilities resulting from relocation-related reimbursement payments.

This policy applies to all *salaried* employees who are transferred from one location to another at the request of the Company, provided that the following guidelines are met:

- The relocation must be approved by BNSF Human Resources
- The distance between your departure residence and the new work location must be 50 miles greater than the distance between your departure residence and your former work location, as stated in the 1993 IRS Revenue Reconciliation Act
- You must execute a Repayment Agreement prior to receiving any relocation-related disbursement (a copy of this Repayment Agreement form is located at the end of this policy)

- All of your relocation benefits related to the move, unless otherwise stated, must be completed by you and your family within 12 months following the effective date of transfer

The relocation policy will apply to all family members who permanently reside within your household on the effective date of transfer. *Should you and your spouse both be employed by BNSF, contact your Cendant Mobility Client Services Consultant for an explanation of benefits before continuing with the moving process.*

This policy is subject to revision by the Company at any time, without notice, as necessary, and is not to be construed as conferring any contractual right or becoming a part of any employment contract. Furthermore, BNSF does not assume any liability for relocation services provided by or arising out of any of the activities of the individual service providers, their agents, representatives, or employees.

(Emphasis in original.) Plaintiff was never given a copy of BNSF's relocation policy by any of her supervisors or other managers. Rather, she obtained a copy from a co-employee who BNSF had provided with relocation benefits.

In addition to the two above-described discussions between plaintiff and the Kansas City crew superintendent (Mr. Carlson), plaintiff also addressed the issue with her Fort Worth crew superintendent (Mr. Connors). Before plaintiff moved from Fort Worth to Kansas City, plaintiff informed Mr. Connors by e-mail (time-stamped 4:33 a.m. on July 1, 1999) that Mr. Carlson had informed her the previous day that he had a position available. In this e-mail, plaintiff further pointed out to Mr. Connors that her husband did not

receive any moving benefits. Thus, plaintiff wanted to know if any moving benefits were available for her. Mr. Connors replied to plaintiff's inquiry the very same day by e-mail (time-stamped 7:17 a.m. on July 1, 1999), as follows:

> Vicky Birmingham is out of pocket but I spoke with Mike Enlow, this position was given to you due to your husbands' [sic] and to keep your family together. The message that Mike received from Vicky [sic] there would *not* be any moving package.
>
> WR Connors.

(Emphasis added.) Plaintiff admits that, in the ordinary course of events, she would have received and read Mr. Connors' e-mail reply. However, plaintiff does not actually remember reading it.

Mr. Connors' July 1, 1999–e–mail refers to two other BNSF managers, namely, Vicky Birmingham and Mike Enlow. In the summer of 1999, Ms. Birmingham supervised BNSF's crew superintendents including Mr. Connors in Fort Worth and Mr. Carlson in Kansas City. Mr. Enlow was another crew superintendent who, like Messrs. Connors and Carlson, reported to Ms. Birmingham.

Ms. Birmingham oversaw all of the administrative functions for the various BNSF crew planners who worked for the crew superintendents immediately under her supervision. Thus, Ms. Birmingham was involved in every crew planner opening, such as whether openings would be filled, what crew planners would be paid, and the like. At the time of plaintiff's relocation from Fort Worth to Kansas City, plaintiff did not have any direct dealings with Ms. Birmingham.

Ms. Birmingham ultimately decided not to provide plaintiff with any relocation benefits. She approved awarding the Kansas City position to plaintiff, but conditioned her approval on the basis that plaintiff would not be paid relocation benefits.

Ms. Birmingham would not have approved awarding plaintiff the Kansas City position if it had included relocation benefits. Ms. Birmingham's decision could have been overridden by David Dealy, BNSF's vice president of operations.

As earlier indicated, at the time of plaintiff's relocation, she did not know that Ms. Birmingham was in charge of crew superintendents because plaintiff had not had any dealings with Ms. Birmingham. Despite the above-described July 1, 1999–e–mail, plaintiff claims that she was not aware of Ms. Birmingham's conditional approval of the relocation from Fort Worth to Kansas City. Plaintiff explains that she applied to the Kansas City crew superintendent (Mr. Carlson), not to Ms. Birmingham, and plaintiff later talked to Mr. Carlson to inquire about the status of her application.

Ms. Birmingham's rationale for her decision not to award plaintiff any relocation benefits was that it allowed her to fill a single vacant position for the cost of one relocation benefit package. That is, given the fact that plaintiff vacated her crew planner position in Fort Worth, BNSF had to transfer another employee to fill plaintiff's Forth Worth position. Therefore, if Ms. Birmingham had also given plaintiff a relocation package, that would have comprised two sets of relocation benefits to fill the one existing vacancy in Kansas City. However, Ms. Birmingham concedes that, at the time that she conditionally approved plaintiff's relocation, it was possible that someone from Fort Worth might have later been selected to fill plaintiff's crew planner position in Fort Worth, in which case BNSF would not have been called on to pay relocation benefits to that employee.

Plaintiff was awarded the crew planner position in Kansas City out of consideration for her personal situation—i.e., so that she could join her husband. This was

the reason plaintiff was offered the position in Kansas City, irrespective of plaintiff's reason for applying for the position. In any event, plaintiff started work in Kansas City in August of 1999.

About three months after plaintiff started working in Kansas City, during the fall of 1999, plaintiff received a telephone call from Ms. Birmingham and Mr. Klug, the assistant vice president of human resources for BNSF. In response to plaintiff's continued inquiries about relocation benefits, Ms. Birmingham and Mr. Klug told plaintiff they had discussed plaintiff's position and had come to a final conclusion to deny the requested relocation benefits.

Significantly, plaintiff does not recall any person of a supervisory level above her at BNSF who ever told her that she would in fact receive a relocation benefits package in connection with her move from Fort Worth to Kansas City. Plaintiff simply points out that certain BNSF employees were looking into why she had not received the applicable paperwork in connection with her request for a relocation package. The only definitive response plaintiff recalls regarding her request for a relocation package came from Mr. Klug and Ms. Birmingham during the above-described telephone conversation in the fall of 1999. To plaintiff's knowledge, her request for relocation benefits was never approved by BNSF's human resources department, as is required by BNSF's written policy.

Despite the lack of any definitive commitment on the issue by the Kansas City crew superintendent (Mr. Carlson), plaintiff assumed that she would be awarded a relocation benefit in connection with her move from Fort Worth. She made this assumption because she believed similarly situated management-level employees were typically awarded relocation benefits. Plaintiff's belief was based, in part, upon her understanding of BNSF's written relocation policy. Plaintiff understood that other crew planners had moved from one position to another and were paid relocation benefits by BNSF, including Debra Goodson who relocated from Kansas City to Spring, Texas, Richard Gallegos who moved from Topeka to Fort Worth, Kaerida Gist who moved from Fort Worth to Kansas City, Sue Cypert who moved from Topeka to Kansas City, and Sandra Gammill who moved from Topeka to Kansas City.

Notably, the record does not support any reasonable inference that *any* of these five allegedly similarly situated employees were transferred under the same circumstances as plaintiff. Nothing in the record suggests that the moves of Ms. Goodson, Mr. Gallegos, Ms. Gist, Ms. Cypert, or Ms. Gammill were motivated by a desire to follow a spousal co-employee who did not receive relocation benefits, nor did any of these other employees' transfers leave BNSF with an opening to fill accompanied by a risk of having to fund a second relocation package for the latter position.

Ms. Birmingham acknowledged that there have been instances when BNSF employees voluntarily moved and received relocation benefits. However, Ms. Birmingham explained that this is because most positions are filled not as a result of the company unilaterally selecting an employee and telling him or her that a move is required, but rather because of BNSF's practice of posting open positions. In response to internally advertised computerized job postings, BNSF receives applications, interviews candidates, and ultimately selects a candidate for the job. If the candidate is a BNSF employee who is then working at another location more than fifty miles away from the posted position, *and* if *both* the employee and the company agree, the parties usually implement the transfer with relocation benefits. When asked un-

der what circumstances salaried employees were eligible for relocation benefits, Ms. Birmingham testified that "[i]f you are accepted into a position that you bid on that is not at your location *and it is authorized up the chain,* then you will be getting the moving benefit package" (emphasis added).

BNSF had one open crew planner position both before and after plaintiff's move from Fort Worth to Kansas City, and BNSF ultimately provided one set of relocation benefits. Plaintiff's move to Kansas City left open a previously filled crew planner position in Fort Worth, and BNSF provided relocation benefits to Mr. Gallegos to fill the Fort Worth position that plaintiff vacated.

According to plaintiff, she did not ask to be "transferred" from Fort Worth to Kansas City. Instead, from plaintiff's perspective, BNSF simply had a job opening in Kansas City, plaintiff applied for that job, and she was awarded the position. Plaintiff maintains that, when a BNSF management employee takes a job with BNSF at a different location, he or she is usually given relocation benefits. Thus, BNSF usually pays for major moves.

When plaintiff started to inquire about her relocation benefits, she was told by somebody in BNSF's human resources department that any benefits would be charged against Mr. Carlson's budget in Kansas City and, therefore, she needed to talk to him. Plaintiff then spoke to Mr. Carlson and he said he would look into the matter. As earlier indicated, however, plaintiff never received a definitive response from Mr. Carlson.

In part, plaintiff bases her claim for relocation benefits on what she perceives to be BNSF's past practice of paying such benefits to similarly situated employees. She was also told verbally (and it was her understanding) that relocation benefits should be given to anybody that moved from job to job if it was more than fifty miles. According to plaintiff, she saw this happen "all the time."

Mr. Enlow, who, as earlier indicated, was one of the crew superintendents under Ms. Birmingham's supervision in the summer of 1999, has been employed by BNSF for almost thirty years. He has worked in twelve different locations during that time. He received relocation benefits each time he moved, although he did not always know before he moved what benefits he would receive.

Due to plaintiff's relocation, plaintiff incurred out-of-pocket and incidental expenses. She had to continue to pay for the Weatherbys' home in Texas after moving to Kansas, and suffered damage to her credit because of a foreclosure. Plaintiff claims that, as a result of the foregoing, she has been unable to purchase another home. Finally, as a result of this occurrence, she consulted a psychotherapist, Steven Blum, for about fifteen months after her move to Kansas City.

III. Applicable Procedural Standards.

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve

the issue either way. *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 670–71 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but must simply point out to the court that the other party lacks evidence on an essential element of its claim. *Id.* at 671 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Adler,* 144 F.3d at 671. The nonmoving party may not simply rest upon its allegations to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671 (internal quotation omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, it must be noted that summary judgment is no longer regarded as a "disfavored procedural shortcut." Instead, summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## IV. Analysis and Discussion.

### A. *Implied Contract Claim.*

BNSF asserts that plaintiff was transferred to accommodate her request to join her husband in Kansas City. Plaintiff's view of this case is different. She maintains that she did *not* request to be transferred. Instead, plaintiff asserts that she asked several BNSF employees whether they knew of any job openings in the Kansas City area and, when she learned that a crew planner job in Kansas City for which she was qualified would be coming open, she verified this information, applied for the job, and was ultimately offered the job, which she accepted.

Plaintiff asserts that the parties' above-described positions in this regard give rise to a material fact in controversy precluding summary judgment because plaintiff maintains that she can establish that BNSF paid relocation benefits to other similarly situated employees under circumstances that create a contractual obligation to pay benefits under the facts of this case. The court respectfully disagrees, for the reasons explained below.

Plaintiff acknowledges that the essential elements of her breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) plaintiff's performance or willingness to perform in compliance with the contract; (4) BNSF's breach of the contract; and (5) damages suffered by plaintiff as a result of BNSF's breach. (Pretrial Order, doc. 23, ¶ 7.1(A).) *See ORI, Inc. v. Lanewala,* 147 F.Supp.2d 1069, 1077–78 (D.Kan.2001) (listing these five elements; citing PIK-Civil 3d § 124.01–A). The parties' written submissions indicate that, as a practical matter, in this case the dispositive essential element is the first one, to wit, wheth-

er any contract existed between the parties.

The pretrial order framed by the parties does not indicate whether plaintiff relies on an express or implied contract theory. Plaintiff's brief in opposition to BNSF's summary judgment motion, however, suggests that implied contract is the principal theory upon which she relies; as earlier indicated, plaintiff alternatively has asserted that she is entitled to recover under quantum meruit. In any event, the record is devoid of any reference to an express agreement between the parties. Therefore, the court will analyze plaintiff's claim under an implied contract theory.

■ Under Kansas law, an implied-in-fact contract arises from facts and circumstances showing a *mutual intent* to contract. *Panis v. Mission Hills Bank,* 60 F.3d 1486, 1492 (10th Cir.1995); *Amoco Production Co. v. Hugoton Energy Corp.,* 11 F.Supp.2d 1270, 1278 (D.Kan.1998) (citing *Mai v. Youtsey,* 231 Kan. 419, 422, 646 P.2d 475 (1982)). In order to form a binding contract, Kansas courts still require a "meeting of the minds" between the parties. *Berry v. General Motors Corp.,* 838 F.Supp. 1479, 1491–92 (D.Kan.1993). Even though an implied-in-fact contract does not involve traditional notions of offer and acceptance, it must nevertheless "represent the manifestation of mutual assent to be bound." *Id.* An employee's unilateral expectation does not create an implied-in-fact contract. *Panis,* 60 F.3d at 1492 (citing *Harris v. Board of Pub. Utils.,* 757 F.Supp. 1185, 1190 (D.Kan.1991)). "A reasonable person must be able to find from all relevant circumstances ... that there was an intent on both sides to be bound." *Id.* (citing *Berry,* 838 F.Supp. at 1492).

■ The question of whether an implied contract exists under Kansas law is typically a question of fact for the jury. *Anglemyer v. Hamilton Co. Hosp.,* 58 F.3d 533, 537 (10th Cir.1995). However, the court may decide the issue on summary judgment "where there is no showing of liability as a matter of law, where there are no essential facts in dispute, and where the plaintiff presents only evidence of his own unilateral expectations." *Warren v. Junction City,* 176 F.Supp.2d 1118, 1126 (D.Kan.2001) (internal quotation omitted) (citing Kansas law).

■ In this case, after carefully considering all of the evidence, the court is left with the firm conviction that there is *no* credible evidence in the record that would allow a rational trier of fact to conclude that plaintiff and BNSF had a *mutual* intent to provide plaintiff with a relocation benefit package in connection with her move from Fort Worth to Kansas City. Even if the court were to indulge plaintiff's suggestion that she was transferred at the request of BNSF (instead of her request), the record fails to support, and indeed refutes, plaintiff's claim of an implied contract to pay her relocation benefits. Plaintiff's own testimony establishes that all of her inquiries about a relocation benefit package were met with equivocal answers (e.g., "I'll check"), or an unequivocal "No." It is uncontroverted that the approval for plaintiff's transfer by the responsible manager, Ms. Birmingham, was conditioned on *no* relocation benefits. It is equally uncontroverted that a relocation package for plaintiff was *never* approved, even tentatively, and the written policy on which plaintiff relies clearly provides that this is a condition to obtaining the package. It is irrelevant whether plaintiff understood or should have understood the condition placed on Ms. Birmingham's approval of plaintiff's transfer from Fort Worth to Kansas City. What ultimately matters is that neither Ms. Birmingham, nor any other manager at BNSF, nor anyone from BNSF's human resources department,

ever intended to provide plaintiff a relocation benefit.

When the court construes the evidence by drawing all reasonable inferences in plaintiff's favor, plaintiff's strongest theory is that BNSF had established a pattern and practice of paying relocation benefits to similarly situated management-level employees who were transferred within the company. However, even this theory fails because the evidence demonstrates that plaintiff *knew* BNSF ultimately possessed discretion in deciding whether to pay her relocation benefits. Plaintiff did not simply transfer to Kansas City with a silent expectation that she would receive these benefits. Instead, she made repeated efforts to secure a definitive commitment from someone with adequate authority to authorize relocation benefits on behalf of BNSF. Before she moved to Kansas City, she asked both Mr. Carlson and Mr. Connors whether she could obtain relocation benefits. After she moved to Kansas City, she again asked Mr. Carlson about the status of her relocation benefits. These inquiries demonstrate that, even if BNSF usually paid relocation benefits to its management-level employees, BNSF employees such as plaintiff knew that there was a second component to this pattern and practice—that is, that these relocation benefits were nevertheless discretionary and required appropriate authorization. In this case, plaintiff failed to obtain this authorization.

In sum, plaintiff has presented nothing more than her own unilateral expectation that she would receive relocation benefits and, simply stated, that unilateral expectation is insufficient to create an implied-in-fact contract. Plaintiff's unilateral expectations, standing alone, cannot be transformed into the mutual intent required to sustain an implied contract claim under Kansas law. Thus, despite plaintiff's creative argument to the contrary, no genuine issue of material fact is involved here.

Plaintiff points out that Kansas recognizes implied contracts of employment, and she argues from that legal premise that there is a sufficient factual issue in this case to present to a jury the question of whether there was an implied contract between her and BNSF for relocation benefits in connection with her move from Fort Worth to Kansas City. In this regard, plaintiff cites and relies on four Kansas cases, including *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 815 P.2d 72 (1991); *Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841 (1987); *Masterson v. Boliden–Allis, Inc.,* 19 Kan.App.2d 23, 865 P.2d 1031 (1993); and *Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, 684 P.2d 1031 (1984).

■ These cases are distinguishable. They all stand for the proposition that, under Kansas law, as an exception to the general rule of employment at will, the facts and circumstances of a particular case may give rise to an implied contract of continued employment, thus limiting the employer's right to terminate the employee only "for cause." Significantly, the case at bar does *not* involve any challenge to the circumstances under which plaintiff's employment with BNSF terminated in 2000. None of the cases cited by plaintiff involved a claim by the plaintiff-employee, or any holding by the court, that the employee had an implied contract for a particular employment fringe benefit. Plaintiff cites no authority—from Kansas or elsewhere—that such a theory states a claim upon which relief can be granted.

■ The court agrees with BNSF that, in actuality, plaintiff is attempting to take Kansas law regarding implied contracts of employment that restrict an employer's right to terminate an employee and engraft upon that body of law implied-

in-fact contract theories for wholly discretionary employment benefits. That is, plaintiff is attempting to expand the law to create a cause of action for the deprivation of such discretionary benefits. The court declines to accept plaintiff's invitation to create a new, common law cause of action on public policy grounds. "Before courts are justified in declaring the existence of public policy, it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt." *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 177, 872 P.2d 252, 262 (1994). The Tenth Circuit has repeatedly cautioned that a court's role is not to act as a super personnel department that second guesses employers' business judgments. *Simms v. Oklahoma*, 165 F.3d 1321, 1330 (10th Cir.1999).

The four cases relied on by plaintiff hold that whether an implied agreement for employment exists usually hinges on the parties' intent and, thus, their state of mind, such that summary judgment generally is inappropriate. Those cases recognize, however, that simply alleging that an implied agreement exists should not preclude summary judgment if all the employee can proffer to the court is his or her own unilateral expectations, with nothing proffered concerning the employer's contractual intent.

**B.** *Quantum Meruit Claim.*

In connection with the pretrial conference in this case, over BNSF's objection, the undersigned magistrate judge granted plaintiff leave to alternatively assert a quantum meruit theory of recovery. (*See* Pretrial Order, doc. 23, ¶ 10.) The pretrial order as well as the parties' written submissions in connection with the instant motion reflect agreement that, under Kansas law, the essential elements of a quantum meruit claim are: (1) a benefit conferred on the defendant by the plaintiff;

(2) an appreciation or knowledge of the benefit by the defendant; and (3) acceptance or retention of the benefit by the defendant under circumstances in which such acceptance or retention is not equitable without payment for its value. *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 259 Kan. 166, 176, 910 P.2d 839, 845 (1996). As explained below, even if plaintiff could satisfy the first and second elements, she cannot satisfy the third.

BNSF's position is that plaintiff conferred *no* benefit to BNSF in connection with her transfer to Kansas City, as her departure from Fort Worth left open her crew planner position in Fort Worth that had to filled by another employee, which was ultimately Mr. Gallegos. BNSF's position certainly is understandable. Viewing the facts of this case in a light most favorable to plaintiff, however, the court believes that, even assuming that plaintiff conferred a benefit on BNSF by filling the crew planner position in Kansas City (because she was an experienced crew planner), and further assuming that BNSF knew of and appreciated that benefit, no inequity would result from allowing BNSF to retain that benefit without reimbursing plaintiff for her relocation expenses. Plaintiff was an experienced crew planner while she was in Fort Worth and while she was in Kansas City, and BNSF paid her as such at all times.

On a net basis, and on a practical, common sense level, the court finds that any arguable benefit plaintiff conferred on BNSF was de minimis as a matter of law. Such a nominal benefit clearly does not implicate the court's equitable powers sufficiently to justify shifting literally tens of thousands of dollars of claimed location expenses from plaintiff to BNSF. After all, it was plaintiff who started the whole process by asking the company to look for a position that would allow her to join her husband in Kansas City.

## C. Damages for Emotional Distress or Mental Anguish.

Finally, the court will briefly address defendant's motion for summary judgment on plaintiff's prayer for damages for emotional distress. Defendant's argument is well-taken and unopposed. However, given the court's ruling granting summary judgment in favor of defendant on both of plaintiff's claims, this issue is moot.

### V. Order.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1. Defendant's motion for summary judgment (**doc. 24**) is granted.

2. Accordingly, the clerk shall enter judgment pursuant to Fed.R.Civ.P. 58 against the plaintiff, Azmina Weatherby, and in favor of the defendant, The Burlington Northern & Santa Fe Railway Co. Plaintiff shall take nothing. This case is dismissed, with prejudice.

3. The clerk shall mail copies of this memorandum and order to all counsel of record.