21 Kan. App. 2d 16 (1995)
JERRY KASTNER, Appellant,
v.
BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., Appellee.
No. 71,659
Court of Appeals of Kansas.
Opinion filed May 5, 1995.
Douglas S. Wright, of Hendrix & Wright, of Topeka, for the appellant.
Alan L. Rupe and Todd N. Tedesco, of Rupe & Girard Law Offices, P.A., of Wichita, for the appellee.
Before PIERRON, P.J., RULON, J., and STEVEN R. BECKER, District Judge, assigned.
PIERRON, J.:
Plaintiff Jerry Kastner appeals from the summary judgment entered against him and in favor of his former employer, defendant Blue Cross and Blue Shield of Kansas, Inc. (Blue Cross). He argues genuine issues of material fact still exist regarding his claim that his employment was wrongfully terminated. We affirm.
*18 Blue Cross extended an offer of employment to Kastner in June 1990. A letter dated June 5, 1990, confirmed the offer of employment and informed Kastner his employment would begin on June 18, 1990. The letter included Kastner's beginning monthly salary rate but contained no promise regarding the length of employment.
Kastner reported for work as a manager of office services on June 18, 1990, as instructed. At the orientation session that day, Kastner was given an employee handbook which contained the following disclaimer:
"This Employee Handbook constitutes a summary of the personnel policies and employee benefits of Blue Cross and Blue Shield of Kansas and its Subsidiary Corporations. The personnel policies or benefits stated herein may be altered at any time. This Handbook does not constitute any part of an agreement among Blue Cross and Blue Shield of Kansas, its Subsidiaries, and the organization's employees. This is an informational handbook and not a contract of employment."
Kastner recalls reading the disclaimer during the orientation. He also admits he did not review either the supervisor's manual or the employee handbook before he made the decision to go to work for Blue Cross. Kastner was advised at the orientation that the provisions of the employee handbook could be changed from time to time by Blue Cross.
At the orientation, Kastner did not read the entire handbook but briefly looked at the chapters. He was instructed that he could read the handbook at his leisure, and he later skimmed through it. According to Kastner, he had a general knowledge of the employee handbook. On June 18, 1990, Kastner signed the following statement:
"I verify that I have read the Kansas Blue Cross-Blue Shield Personnel Policy Booklet and agree to govern my actions accordingly during the length of my employment with the organization.
"I understand that violation of any policies covered in the booklet are just cause for termination."
In June 1990, a memorandum was sent to the board of directors, officers, and all exempt staff of Blue Cross, including Kastner. The memorandum informed the reader that "[i]t is a requirement, annually, that the Board of Directors and all exempt staff of Blue Cross and Blue Shield of Kansas, Inc., complete a Conflict of Interest *19 Questionnaire." The memorandum included a corporate resolution adopted by the board of directors in 1983 which provided in relevant part:
"`NOW, THEREFORE, BE IT RESOLVED: That annually all directors, officers and management employees shall participate in a conflict of interest procedure by completing a questionnaire which, together with explanatory information, will be forwarded to them, and that the Board of Directors of Blue Cross and Blue Shield of Kansas, Inc. adopts the following Code of Ethics:
"`FIRST  Directors, officers and management employees shall exercise the utmost good faith in all transactions touching upon their duties to the corporation and its property. In their dealings with and on behalf of the corporation, they are held to a strict rule of honest and fair dealing between themselves and the corporation. They shall not use their positions, or knowledge gained therefrom, so that a conflict might arise between the corporation's interest and that of the individual.'"
On December 6, 1990, Kastner's supervisor, Bob Young, evaluated Kastner's first six months of employment as being within the "expected" range. Kastner received a rating of 108 out of a possible 196. He received a salary increase on December 10, 1990, and again on January 10, 1991. The later salary increase, amounting to 1%, was apparently necessitated by a change in the salary ranges of Blue Cross.
In January 1991, Kastner began experiencing stress from a number of different sources. During his deposition, Kastner testified that prior to January 23, 1991, he had been experiencing stress because of his own marital difficulties. On January 23, 1991, Kastner learned he was the potential defendant in an alienation of affections lawsuit. The potential plaintiff in the alienation of affections lawsuit was the husband of a Blue Cross employee, Alice Moser. Kastner was Moser's supervisor. The potential lawsuit caused additional stress to Kastner.
On January 25, 1991, Kastner asked Young to call him at home that evening. Young called Kastner, and the conversation centered around space planning for a building the company was purchasing. Kastner stated he got the impression that Young wanted him to lie to Young's supervisor about the amount of space available in the building.
*20 Alice Moser's divorce was also discussed during the phone conversation. After Kastner informed Young that Moser was unproductive because of her pending divorce. Young suggested they do what they could to reconcile Moser and her husband to increase her productivity.
On January 30, 1991, Kastner and Young met in Young's office. During the meeting, Kastner told Young he felt like Young was asking him to lie to Young's supervisors regarding space planning. Kastner also told Young that he thought Young was harassing him to reconcile Moser and her husband. The meeting was stressful for Kastner. He requested that JoAnn Mzhickteno, the company's EEO Coordinator, be present for the remainder of the meeting. Immediately following the meeting with Young, Kastner met with Don Lynn, Young's supervisor. Kastner told Lynn about the problems he perceived with Young.
Kastner also went to see Mzhickteno to obtain a referral to an employee assistance counselor to help him deal with stress. The Employee Assistance Program (EAP) was one of the benefits available to the employees of Blue Cross. The program was described in the employee handbook as follows:
"The organization recognizes the fact that at times personal problems may have an adverse effect on an employee's performance on-the-job. These problems include, but are not limited to Alcohol and/or Drug Abuse by the employee or a family member, financial difficulties, marital difficulties, legal problems, family problems, mental/emotional problems, or physical problems.
"The organization also recognizes the fact that our management and supervisory personnel do not have the professional qualifications to counsel an employee faced with one or more of these problems. To enable our employees to cope with these problems, the organization implemented an Employee Assistance Program (EAP). The EAP is designed to assist employees and their families in dealing with personal problems that pose a threat to their health, well being, and possibly their jobs. Professional, qualified counselors, who are employees of the Family Service and Guidance Center are available at any time to assist all employees."
Mzhickteno informed Kastner that he did not need a referral in order to see a counselor. Nonetheless, she set up an appointment for Kastner to meet with Joy Burchfield, EAP counselor. Kastner apparently met with Burchfield.
*21 On February 1, 1991, Kastner and Young met again. The topic of Moser's divorce came up again, and the meeting apparently got heated. Once again, Kastner requested that Mzhickteno be present during the remainder of the meeting. When Mzhickteno joined the meeting, Kastner maintains that she said something to the effect that it would be in everyone's best interest to leave that subject alone.
On February 5, 1991, Young terminated Kastner's employment with Blue Cross. The decision to terminate Kastner was made by Young. During his deposition, Young testified he did not know Kastner had sought assistance through the EAP. Kastner admitted he has no evidence suggesting Young knew he had sought assistance through the EAP. When Mzhickteno was asked if Young knew that Kastner had been referred to an EAP counselor, she responded, "My guess is yes, but I really don't  ."
Kastner filed an action for wrongful termination of employment against Blue Cross. He alleged the termination was without good cause and in breach of an implied-in-fact contract of employment. In addition, he alleged the termination breached the employer's duty of good faith and fair dealing. Finally, Kastner alleged his termination was in retaliation for utilizing the EAP.
After the completion of discovery, Blue Cross filed a motion for summary judgment against Kastner. On March 18, 1994, the district court filed its memorandum decision and order granting Blue Cross' motion for summary judgment.
The rules relating to summary judgment and this court's standard of review are well established:
"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ *22 as to the conclusions drawn from the evidence, summary judgment must be denied." Kerns v. G.A.C., Inc., 255 Kan. 264, 268, 875 P.2d 949 (1994).
A defendant is entitled to summary judgment by establishing the absence of evidence necessary to support an essential element of the plaintiff's case. Hammig v. Ford, 246 Kan. 70, 73, 785 P.2d 977 (1990); Crooks v. Green, 12 Kan. App.2d 62, 64, 736 P.2d 78 (1987). To oppose summary judgment, the opposing party must actively come forward with something of evidentiary value to establish a disputed material fact. Glenn v. Flemming, 247 Kan. 296, 305, 799 P.2d 79 (1990); Slaymaker v. Westgate State Bank, 241 Kan. 525, 531, 739 P.2d 444 (1987).
In this case, Kastner acknowledges that no express contract existed between the parties. Instead, he maintains that an implied-in-fact contract of employment was created, a position contrary to that earlier expressed by his counsel. Blue Cross, on the other hand, argues the trial court was correct in finding Kastner completely failed to produce evidence that it intended to create anything other than an unqualified employment-at-will relationship.
In Johnson v. National Beef Packing Co., 220 Kan. 52, Syl. ¶ 1, 551 P.2d 779 (1976), the Kansas Supreme Court stated the general rule:
"In the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged."
Accord Allegri v. Providence-St. Margaret Health Center, 9 Kan. App.2d 659, Syl. ¶ 4, 684 P.2d 1031 (1984).
It has been said that "[u]nder the American common law, an employer may discharge an `at-will employee' for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." Accord Brown v. United Methodist Homes for the Aged, 249 Kan. 124, 134, 815 P.2d 72 (1991); Morriss v. Coleman Co., 241 Kan. 501, 508, 738 P.2d 841 (1987).
Due to the potential for harsh and unjust results arising from the employment-at-will doctrine, judicially created exceptions have *23 eroded the doctrine. Morriss, 241 Kan. at 509. One of the most important exceptions to the employment-at-will doctrine allows an action for wrongful discharge when an employee is fired in breach of an implied-in-fact contract of employment. See generally Worth and Landis, Fire at Will? The Status of Judicially Created Exceptions to Employment-at-Will in Kansas, 64 J.K.B.A. 22 (Feb./Mar. 1995).
A cause of action for breach of an implied-in-fact contract of employment was first allowed in Allegri v. Providence-St. Margaret Health Center, 9 Kan. App.2d 659. In Allegri, this court wrote:
"It is well recognized that parties may become contractually obligated by their nonverbal conduct as well as by their use of oral or written words. [Citation omitted.] A review of the record indicates sufficient testimony to raise a material question whether the conduct of the parties evidenced an implied employment agreement." 9 Kan. App.2d at 664.
See Morriss, 241 Kan. 513 (adopting the reasoning of Allegri and the implied-in-fact contract of employment theory.)
The Allegri court recognized that "`[a] contract implied in fact arises from facts and circumstances showing mutual intent to contract.'" 9 Kan. App.2d at 663 (quoting Mai v. Youtsey, 231 Kan. 419, 422, 646 P.2d 475 (1982). Such an agreement cannot be established solely by the employee's subjective understanding or expectation about his or her employment. Brown, 249 Kan. at 133. "Intent of the contracting parties is a question of fact and may be shown by acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct evidence." Allegri, 9 Kan. App.2d 659, Syl. ¶ 6.
"Where it is alleged that an employment contract is one to be based upon the theory of `implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced." 9 Kan. App.2d 659, Syl. ¶ 5.
*24 See Johnson, 220 Kan. at 54 (where no definite term of employment is expressed, the duration of employment depends on the intention of the parties as determined by the circumstances in each particular case).
The district court granted defendant's motion for summary judgment, finding Kastner failed to submit evidence of a legitimate factual dispute regarding the parties' intent to create an implied employment contract. Intent of the contracting parties is normally a question of fact for the jury, and the determination of whether there is an implied contract of employment requires a factual inquiry. Morriss, 241 Kan. at 512; see Brown, 249 Kan. at 134.
"A party's intent must usually be proven by circumstantial evidence, and summary judgment is rarely appropriate in such instances. `A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties.'" Marinhagen v. Boster, Inc., 17 Kan. App.2d 532, 540, 840 P.2d 534 (1992), rev. denied 252 Kan. 1092 (1993) (quoting Stanfield v. Osborne Industries, Inc., 7 Kan. App.2d 416, Syl. ¶ 8, 643 P.2d 1115 [1982]).
Accord Cooper v. RE-MAX Wyandotte County Real Estate, Inc., 241 Kan. 281, 283, 736 P.2d 900 (1987); Henrickson v. Drotts, 219 Kan. 435, 438, 548 P.2d 465 (1976); Allegri v. Providence-St. Margaret Health Center, 9 Kan. App.2d 659, Syl. ¶ 3.
However, "summary judgment may be granted when the evidence shows no liability as a matter of law and where the essential facts are not in dispute." Ruebke v. Globe Communications Corp., 241 Kan. 595, 606, 738 P.2d 1246 (1987). Kastner argues that when the intent of one of the parties is at issue, summary judgment is inappropriate. Although the courts of this state have repeatedly warned that summary judgment is "rarely appropriate" when state of mind is at issue and the trial court must "be cautious" in such a situation, summary judgment is not precluded and is even appropriate in some cases.
"Although the existence of an implied contract of employment is normally a question of fact for the jury, . . and almost always inappropriate for summary judgment resolution, . . summary judgment may be granted if the plaintiff presents only evidence of his own unilateral expectations of continued employment." Conyers v. Safelite Glass Corp., 825 F. Supp. 974, 977 (D. Kan. 1993).
*25 The district court's entry of summary judgment will not be disturbed on appeal if, viewing the evidence in the light most favorable to Kastner, the evidence fails to create a genuine issue of material fact regarding the existence of an implied-in-fact contract of employment.
As previously noted, to oppose summary judgment the opposing party must actively come forward with something of evidentiary value to establish a disputed material fact. Glenn, 247 Kan. at 305; Slaymaker, 241 Kan. at 531. To have evidentiary value, the particular document or testimony relied upon by the party opposing summary judgment must be probative of that parties' position on a material issue of fact. Probative evidence, as noted in Akin v. Estate of Hill, 201 Kan. 306, 311, 440 P.2d 585 (1968), is that which "`furnishes, establishes or contributes toward proof.'"
Kastner argues the record contains evidence of the parties' intent to enter an implied-in-fact contract of employment. First, Kastner points to the letter of June 5, 1990, from Patrick Mulligan confirming the offer of employment. In addition, he relies on the fact that he accepted the position and reported for work on June 18, 1990. As noted by the district court, Kastner "fails to demonstrate how this offer and acceptance pertain to anything other than the salary terms and the starting date. Nowhere on the employment offer is there a promise that the Plaintiff will be terminated only for good cause." Even viewed in the light most favorable to Kastner, the offer of employment and Kastner's acceptance contribute nothing to support the existence of an implied employment contract.
Kastner also relies on the statement he signed on his first day of employment. The statement provides in relevant part: "I understand that violation of any policies covered in the booklet are just cause for termination." According to Kastner, informing the employee that a violation of the provisions of the employee handbook is "just cause" for termination is tantamount to an agreement that an employee will only be terminated for just cause.
Blue Cross counters by arguing the statement plainly does not promise that termination will only be for just cause. According to Blue Cross, it merely states that violation of any policies covered in the booklet are just cause for termination. The district court *26 found in favor of Blue Cross' position, concluding: "[T]he statement is clear, if the policies are violated you may be terminated. However, the statement does not, in any way, indicate that employees may be terminated only for good cause." The statement does not evidence an implied-in-fact employment contract under which an employee may be terminated only for good cause. Telling an employee about certain grounds for termination is not the same as telling an employee that he or she will not be terminated absent those grounds.
Kastner next relies on the corporate resolution given to the directors, officers, and management employees regarding the duty of good faith and fair dealing owed to the corporation. Although the relevant sections of the corporate resolution have been previously stated, we repeat them here:
"`FIRST  Directors, officers and management employees shall exercise the utmost good faith in all transactions touching upon their duties to the corporation and its property. In their dealings with and on behalf of the corporation, they are held to a strict rule of honest and fair dealing between themselves and the corporation. They shall not use their positions or knowledge gained therefrom, so that a conflict might arise between the corporation's interest and that of the individual.'"
According to Kastner, this portion of the corporate resolution supports the existence of an implied-in-fact employment contract. Blue Cross, on the other hand, argues the corporate resolution was given to Kastner after he accepted the position and began working. Therefore, Blue Cross maintains the resolution could not form the basis of any intent on the part of Kastner or Blue Cross to enter into an implied contract. Moreover, Blue Cross argues the resolution has nothing to do with employee termination. Instead, the resolution merely prohibits conflicts of interest in dealing with the corporation. The resolution states that corporate management owes a duty to the corporation. It says nothing about any duty owed by the corporation to management.
Blue Cross' point is well taken. Kastner was not given the corporate resolution until after he began working for Blue Cross in June 1990 In Conyers v. Safelite Glass Corp., 825 F. Supp. at 978, the federal district court pointed out that "personnel rules which *27 are not bargained for cannot alone be the basis for an express or implied contract of employment." See Riddle v. City of Ottawa, 12 Kan. App.2d 714, 718-19, 754 P.2d 465, rev. denied 243 Kan. 780 (1988). Kastner did not bargain for the provisions of the corporate resolution.
More importantly, to read the corporate resolution to impose a requirement upon Blue Cross to terminate employment only for good cause wholly ignores the language of the resolution. The resolution placed duties of good faith and fair dealing on Kastner. It does nothing to impose such duties on Blue Cross. The resolution simply is not probative of the existence of an implied-in-fact contract of employment.
Kastner next argues that statements of the company's preference that an employee get the medical or professional help needed so that the company would not be forced to terminate the employee are evidence of an implied-in-fact contract of employment. The memorandum relied upon by Kastner discusses the EAP and provides:
"You may make an appointment to discuss any problem with [the occupational consultant] by any of the following approaches.
....
"Involuntary
"If you have a personal problem that is adversely affecting your performance, your supervisor may require you to schedule an appointment with the consultant. We would much rather have an employee receive the assistance needed to improve performance than be forced to terminate the employee."
The employee handbook also included the following language referring to the EAP:
"If the recommended course of action is not followed and performance continues unacceptable, the employee will be terminated. While under treatment the employee continues to receive all benefits for which eligible."
Again, Kastner fails to demonstrate how these statements are relevant to whether an implied-in-fact contract of employment was intended. The statements are not probative of whether an implied-in-fact contract of employment, requiring good cause for termination, existed between Kastner and Blue Cross. As noted by Blue *28 Cross, these statements do not promise that he would be terminated only for good cause.
Finally, Kastner relies on the performance review completed in December, 1990. The evaluation states:
"The purpose of the Performance Evaluation is to identify the level of performance of the employee and to improve performance by establishing an understanding of weaknesses and recognition of strong points. The evaluation is an aid to determine persons eligible for promotion, merit salary increases, and termination of employees, if necessary."
As the other evidence relied upon by Kastner, the performance evaluation is not probative of whether an implied-in-fact contract of employment existed between the parties. In no way does the performance evaluation suggest that Kastner could be terminated only for good cause. Although it arguably suggests that an employee could be terminated after receiving a poor performance evaluation, it does not suggest that the parties intended a contract which allowed termination only if good cause existed.
Kastner has failed to come forward with evidence to establish a material issue of fact regarding the intent of the parties to form an implied-in-fact contract of employment. See Plummer v. Humana of Kansas, Inc., 715 F. Supp. 302, 304 (D. Kan. 1988) (holding summary judgment appropriate where "[n]o issue of intent is presented because plaintiff shows the court no evidence which would indicate Humana intended to create an employment contract.").
In Morriss, the Supreme Court addressed the effects of a disclaimer on plaintiff's claim that an implied contract existed. The court wrote:
"The disclaimer in the supervisor's manual quoted above does not as a matter of law determine the issue. It has not been established that the disclaimer was brought to the personal attention of its employees or that it was intended by Coleman to create an unqualified employment-at-will relationship, especially in view of other provisions in the manual and the statements made by Coleman's supervisors to the employees." 241 Kan. at 514.
In this case, Kastner admitted reading the disclaimer in the handbook which stated the policies were not intended to be a contract of employment. Nonetheless, Kastner argues the disclaimer should not affect his claim because of the statement he signed *29 stating that a "violation of any policies covered in the booklet are just cause for termination." He argues this statement conflicts with the language of the disclaimer, thereby creating a material issue of fact regarding the intent of the parties. Kastner's contention is without merit. As noted, informing an employee of certain grounds for termination is not the same as telling an employee that he or she will not be terminated absent those grounds.
In Plummer, the plaintiff admitted reading a disclaimer similar to the disclaimer in this case. The federal district court found that, "unlike Morriss, there is no evidence that management indicated dismissal would only be `for cause.'" 715 F. Supp. at 304. Therefore, the court found that no implied contract of employment existed and summary judgment was appropriate.
The disclaimer in this case makes it clear that Blue Cross did not intend to form a contract with Kastner. Furthermore, there is no evidence suggesting a contrary intent. The district court properly granted Blue Cross' motion for summary judgment on Kastner's claim of a breach of an implied-in-fact contract of employment.
Kastner next argues the district court erred in holding that Blue Cross did not owe him a duty of good faith and fair dealing. Section 205 of the Restatement (Second) of Contracts (1979) provides:
" § 205 Duty of Good Faith and Fair Dealing
"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."
In Morriss, the Supreme Court held: "The principle of law stated in Restatement (Second) of Contracts § 205 (1979), that every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement, is held to be overly broad and not applicable to employment-at-will contracts." 241 Kan. 501, Syl. ¶ 2. Kastner acknowledges the holding in Morriss but argues it should be overruled.
It is well established that this court is without authority to overrule decisions rendered by the Supreme Court. Downes v. IBP, Inc., 10 Kan. App.2d 39, 40, 691 P.2d 42 (1984), rev. denied 236 Kan. 875 (1985). Furthermore, "`[t]his court is duty bound to follow *30 the law as established by Kansas Supreme Court decisions, absent some indication the Supreme Court is departing from its previously expressed position.'" Gruhin v. City of Overland Park, 17 Kan. App.2d 388, 391, 836 P.2d 1222 (1992) (quoting Batt v. Globe Engineering Co., 13 Kan. App.2d 500, 507-08, 774 P.2d 371, rev. denied 245 Kan. 782 [1989]). The Supreme Court recently reaffirmed its holding that an implied covenant of good faith and fair dealing is not applicable to an employment-at-will relationship. Dickens v. Snodgrass, Dunlap & Co., 255 Kan. 164, Syl. ¶ 6, 872 P.2d 252 (1994). We follow that decision.
Kastner next argues the district court erred in granting summary judgment in favor of Blue Cross on his claim that he was terminated in violation of a well-established public policy. In Dickens, the Supreme Court wrote:
"An employee-at-will is just that. He or she may be terminated without cause. The only exceptions thereto arise from public policy. An employee-at-will may not be terminated in retaliation for: having filed a workers compensation claim, Murphy v. City of Topeka, 6 Kan. App.2d 488, 630 P.2d 186 (1981), or for `whistle-blowing,' Palmer v. Brown, 242 Kan. 893, 752 P.2d 685 (1988)." 255 Kan. at 176-77.
Kastner urges this court to extend the public policy exception to the employment-at-will doctrine to authorize a cause of action for retaliatory discharge where an employee is terminated for utilizing an employee assistance program. "Before courts are justified in declaring the existence of public policy, however, `it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt.'" Palmer, 242 Kan. at 897 (quoting Noel v. Menninger, 175 Kan. 751, Syl. ¶ 4, 267 P.2d 934 [1954]).
Even assuming, arguendo, that utilizing an EAP warrants invocation of the public policy exception, Kastner's argument must fail. The difficulty with his position is that there is no evidence that he was terminated in retaliation for seeing the EAP counselor. See Palmer, 242 Kan. at 900 (holding in a whistle-blowing retaliatory discharge case that an employee has the burden of proving the employer had knowledge of the employee's reporting of a violation of the law prior to discharging the employee); Stuart v. Beech Aircraft *31 Corp., 753 F. Supp. 317 (D. Kan. 1990), aff'd 936 F.2d 584 (10th Cir.1991). Young, who made the decision to terminate Kastner's employment, testified that he did not know Kastner had sought assistance through the EAP. Kastner himself acknowledged at his deposition that he had no evidence showing that Young knew about his visit with the EAP counselor.
The district court was correct in entering summary judgment in favor of Blue Cross on Kastner's claim that he was terminated in retaliation for utilizing the EAP.
Affirmed.