**Sheilah M. DAVIS, Plaintiff,**

v.

**WAL–MART STORES, INC., a Delaware Corporation; and Wal–Mart Stores, Inc. Associates Health and Welfare Plan, Defendants.**

No. 98–1199–JTM.

United States District Court, D. Kansas.

Sept. 22, 1999.

Paul S. McCausland, Young, Bogle, McCausland, Wells & Blanchard, Wichita, KS, for Plaintiff.

Christopher R. Hedican, Baird, Holm Law Firm , Omaha, NE, for Defendant.

## ORDER

MARTEN, District Judge.

Sheilah Davis brought three claims against the defendants, alleging that (1) she was wrongfully denied medical bene-

fits by Wal–Mart Stores, Inc. Associates Health and Welfare Plan ("the Plan"); [1] (2) she was terminated by Wal–Mart Stores, Inc. ("Wal–Mart"): (a) in retaliation for requesting payment of health benefits; and (b) for the purpose of interfering with her future use of benefits in violation of ERISA § 510; [2] and (3) she had an employment contract with Wal–Mart, and Wal–Mart breached that contract.

Two issues, which are the subject of summary judgment motions, are pending before the court: (1) whether an employment contract existed between Wal–Mart and Davis, and if so, whether Wal–Mart breached the contract; and (2) whether Davis is entitled to attorney's fees on her § 502 ERISA claim. Both issues are ripe for the court's consideration. For the reasons set forth below, Wal–Mart's motion for summary judgment on Davis's contract claim is granted and Davis's motion for summary judgment on her claim for attorney's fees is denied.

## I. Facts

On January 20, 1997, Davis applied for a cashier position at Wal–Mart at its Derby, Kansas Super Center. She completed an application that included the following acknowledgment:

I understand that this application is not a contract, offer, or promise of employment and that if hired I will be able to resign at any time for any reason. Likewise, the company can terminate

my employment at any time with or without cause. I further understand that no one other than the President of Wal–Mart Stores, Inc., or Vice President of its People Division has the authority to enter into an employment contract or agreement with me, and that my at-will employment can be changed only by a written agreement signed by the President of Wal–Mart Stores, Inc. *I have read, understand, and agree to this statement.*

Davis placed her initials beside the acknowledgment and signed her name below it. At the time she completed the application, she received no other written materials. Davis admits that when she completed the application, she understood that she could resign at any time and that Wal–Mart could fire her with or without cause at any time and that this "at-will" status could only be modified by the President of Wal–Mart or the Vice President of its People Division. [3] Davis Dep. at 46–47.

A few days after Davis submitted her application, Wal–Mart offered her a temporary cashier position. The parties did not negotiate Davis's pay or work schedule. [4] Wal–Mart stated the pay she would receive and the hours she would work, and it was Davis's decision to "take it" or "leave it." *Id.* at 43. Davis accepted the cashier position and signed several other documents that indicated they were not employment contracts and that she was employed at-will. [5] Wal–Mart also gave

---

1. The Plan has since paid the claims that had previously been denied. Therefore, the only remaining issue regarding Davis's claim for benefits is whether she is entitled to attorney's fees pursuant to § 502 of ERISA, which the parties have agreed to resolve on summary judgment. Davis has submitted a motion for summary judgment, and the matter has been fully briefed.

2. Davis has informed the court that discovery proved she had no ERISA claim. Thus, her second claim is no longer before the court.

3. Davis admits she did not know the President of Wal–Mart or the Vice President of its People Division. She also admits that she never received any documents from either one of them.

4. Davis claims she applied for the day shift with the understanding Wal–Mart would try to schedule her on that shift. She worked her assigned shifts and Wal–Mart eventually assigned her to the day shift.

5. These documents included a letter to new temporary Wal–Mart associates, an acknowledgment form regarding Wal–Mart's alcohol and drug policy, and the employee handbook. Davis admits she signed exhibit 8, which is an acknowledgment that she has read and understood the contents of the Wal–Mart Associate Handbook. However, she does not remember reading, seeing or receiving a copy of the handbook. She does recall reviewing information on a computer and taking a test on much of the information in the handbook.

Davis an Associate Benefits Book, which explained the company's health benefits and leave of absence policy. Davis admits she read the benefits book at the time she enrolled and that the leave of absence policy is set forth in the benefits book.

Davis felt sick and left work on October 14, 1997. On that same day, her husband delivered a note to Wal–Mart from her physician, Dr. White. She did not speak to anyone at Wal–Mart about the note, which stated she was to return to work in one week. Davis submitted another note dated October 23, 1997, which excused her until October 29, 1997. She did not deliver the note herself. Dr. White submitted another note on Davis's behalf that was dated October 29, 1997. Upon Davis's request, her husband delivered it to Mark Spurrier, the general merchandise co-manager of the Derby Wal–Mart. The note stated she should be excused from work due to illness until further notified. The note did not state why Davis was going to be gone, identify the nature of her condition, or state the anticipated return to work dates, all of which are required under Wal–Mart's leave of absence policy. Davis argues that at the time Dr. White submitted the note, she did not know how long she would be off work because she did not know the nature of her illness.

Davis's doctors eventually discovered that she suffered from a hiatal hernia. Her medical records reflect that she underwent two diagnostic procedures in October 1997, a Nissen fundoplication surgery by Dr. Smith on November 24, 1997, and further diagnostic tests at Wesley Medical Center on January 12, 1998, and February 6, 1998. Dr. Smith released her to return to work on April 24, 1998.

A Wal–Mart employee who wishes to obtain a leave of absence must request it from a manager and only Bruce Cowart, the store manager, can approve it. Wal–Mart's Associate Benefits Book describes the procedure for seeking and obtaining a leave of absence. One step of the procedure requires an employee to submit leave form WMP7, which Davis failed to do. Wal–Mart's attendance policy also requires employees to personally notify their supervisors each day before their scheduled times to report to work if they are unable to come to work or will be arriving late for their shifts. Failure to report to work for three consecutive days without proper notification is considered a voluntary resignation.

Spurrier recalls seeing the note dated October 29, 1997.[6] He discussed it with Amy Wojcik, the personnel manager. He denies receiving the note from Davis's husband or being contacted by a family member with it. He does not have any information that indicates Davis received a leave of absence packet. He claims he would gladly give a packet to family member if they came to the store and requested one. He had no experience or training for a situation like Davis's where a note was submitted requesting unlimited time off.

Davis admits that under the leave of absence policy she had an obligation to submit her request for leave to her supervisor or facility manager. However, she never submitted a request for a leave of absence, and Cowart never approved any such leave. Davis further admits she had an obligation to keep Wal–Mart informed of the status of her condition and to submit a health care provider certification under the leave of absence policy as set forth in the Associate Benefits Book. She also agrees that the certification should have stated the day her leave would commence, the nature and appropriate facts concerning her condition, her anticipated return to work date, and the duration and description of her condition. However, Davis thought she was fulfilling her obligations

---

6. In response to the October 29, 1997 note, Wal–Mart claims Spurrier called Dr. White who indicated he did not know how long Davis would be gone and did not identify her condition as the reason for her absence. Davis's absence from work continued through November and December 1997.

by submitting her doctor's excuses. She further thought Dr. White was providing Wal–Mart updates on her condition.[7] Davis also contends she went into Wal–Mart on the day before she had surgery and spoke to her immediate supervisors, Carolyn Thomas and Sarah Brahan. She allegedly told Thomas and Brahan she would be back as soon as she was able, and they supposedly told her to hurry and get back to work. However, there is no evidence in the record that suggests either woman had the authority to approve a leave of absence.

During the time Davis was absent from her job at Wal–Mart, Spurrier claims he attempted to reach her several times by telephone, but was unsuccessful. Wal–Mart's personnel manager also tried to reach Davis without success. Davis claims no one from Wal–Mart requested any information concerning her illness after October 29, 1997.

On December 30, 1997, after discussing Davis's situation with Cowart and receiving his support, Spurrier terminated Davis for job abandonment. Davis received notice of her termination on January 15, 1998, when she received a COBRA notice from the Plan advising her of her right to continue health coverage. Davis did not receive any notice of her termination from Wal–Mart.

Davis called Spurrier the day she received notice of her termination. Spurrier told her she was fired for not reporting to work. Davis explained to him that she had a medical excuse and was planning to return to work. Spurrier informed Davis that she was not keeping in contact with the store and that Wal–Mart representatives were not aware of the circumstances surrounding her extended absence. Spurrier refused to reconsider Davis's situation and told her she was terminated.

Davis admits she was searching for jobs sometime between October 1997 and January 1998 when she was not working at Wal–Mart. She claims she was looking for jobs that were closer to her home. Her sister, nephew and daughter-in-law were also applying for jobs during this time. Davis admits that her sister accompanied her when she was looking for jobs. Davis does not drive and has to catch rides with others. She also admits that she may have told coworkers before she left Wal–Mart that she "wanted to or planned to quit." Davis Dep. at 103–04. However, Davis contends she was planning to return to work at Wal–Mart after her surgery.

Wal–Mart contends that Davis hated her job and hoped she would be fired by the company so she could sue it. Several people heard her make statements to that effect. According to these individuals, she allegedly refused to answer her telephone when Wal–Mart representatives called because she did not want to talk to anyone at Wal–Mart.

Davis, however, disputes these allegations. According to her, during the period of October 1997 to December 1997, she had "call notes," an answering service that recorded telephone messages, and caller ID.[8] According to Davis, no one from Wal–Mart attempted to contact her while she was on leave.

According to Davis, the witnesses who claim she refused to answer calls from Wal–Mart and that she stated a desire to sue the company are her sister, Donna, Davis's son, Jeff, and his wife, Dorcie. Apparently, these family members experienced a major dispute in February 1998. Davis believes these individuals have turned against her because of the tension in the family. *See* Pl.'s Mem. at ¶¶ 56–57.

---

7. Davis claims she was in Dr. White's office when he called Spurrier. Dr. White supposedly called to keep Wal–Mart posted on her condition. Davis recalls two such conversations.

8. In order to identify a caller on call notes, she had to call the telephone company to retrieve any messages that had been left. Caller ID displays the last 50 telephone numbers of individuals who have attempted to call.

Davis feels she was fired because Wal–Mart did not want to pay for her medical benefits. She cannot think of any other reason for her termination. However, she knows of no one who told her she was being fired because she was obtaining benefits, nor has she seen any documents that indicate she was fired because she was using or requesting benefits.

Davis argues she had a contract whereby Wal–Mart was required to keep her job open while she was on leave. She bases her contract claim on the following: (1) she turned in a medical excuse; (2) Dr. White was allegedly calling Spurrier with medical updates; and (3) Spurrier allegedly told Dr. White she still had a job once she recuperated.[9] Basically, Davis believes the medical leave provision in the benefits handbook created a contract between her and Wal–Mart. She admits that no one at Wal–Mart told her they would hold her job open indefinitely. No one told her she did not have to stay in contact with Wal–Mart. And, no one told her she did not have to specifically request a medical leave.

More facts are added as they become relevant to the court's discussion.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir.1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving

party need not disprove the non-moving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Analysis

### A. Breach of Contract Claim

Kansas adheres to the common law doctrine of employment-at-will wherein employees are considered at-will in the absence of an express or implied contract. *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976). For an employment contract to exist, the intent of the parties to continue the employment relationship or to forswear certain grounds for termination must be mutual and must

---

**9.** Davis also claims Carolyn Thomas and Sarah Brahan told her she would have a job and

to hurry back to work.

be ascertained from the totality of the circumstances. *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995); *Harris v. Board of Pub. Utils.*, 757 F.Supp. 1185, 1190 (D.Kan.1991). A party alleging the existence of an implied contract need not produce an abundance of evidence to defeat a summary judgment motion. *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1165 (10th Cir.1992). Thus, whether an implied contract of employment exists is generally a question of fact for the jury. *Anglemyer*, 58 F.3d at 537; *Morriss v. Coleman Co.*, 241 Kan. 501, 512, 738 P.2d 841 (1987). "[U]nder Kansas law, summary judgment remains 'rarely appropriate' in implied contract cases because of the necessity of determining both parties' subjective intent to form a contract." *Anglemyer*, 58 F.3d at 537 (quoting *Kastner v. Blue Cross & Blue Shield of Kan., Inc.*, 21 Kan.App.2d 16, 894 P.2d 909 (1995)).[10] However, summary judgment is not precluded where there is no showing of liability as a matter of law, where there are no essential facts in dispute, and where " 'the plaintiff presents only evidence of his own unilateral expectations of continued employment.' " *Kastner*, 21 Kan.App.2d at 24, 894 P.2d 909 (quoting *Conyers v. Safelite Glass Corp.*, 825 F.Supp. 974, 977 (D.Kan. 1993)).

The Kansas Supreme Court has outlined factors to be considered in determining whether an implied contract exists:

"Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment rela-

tionship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

*Morriss*, 241 Kan. at 513, 738 P.2d 841 (quoting *Allegri v. Providence—St. Margaret Health Ctr.*, 9 Kan.App.2d 659, 684 P.2d 1031 (1984)). To defeat summary judgment of an implied contract claim, the plaintiff must present evidence from a manual or handbook, along with some independent evidence probative of the employer's intent. *Farthing v. City of Shawnee*, 39 F.3d 1131, 1139 (10th Cir.1994). Under Kansas case law, "an employee cannot create a jury question on the issue by reliance on only one factor, whether that be a statement in the policy manual or a statement from the employer." Worth & Landis, *Fire at Will? The Status of Judicially Created Exceptions to Employment-at-Will in Kansas*, 64 J.K.B.A. No. 2, 22, 25 (1995); *see also Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 138, 815 P.2d 72 (1991) ("The written personnel policy alone is not sufficient to establish an implied contract of employment of a term of specific duration."). Thus, summary judgment may still be appropriate when the plaintiff's evidence is limited either to general policies in a handbook or to oral statements by management. *See Plummer v. Humana of Kan.*, 715 F.Supp. 302, 304 (D.Kan.1988) (granting summary judgment where plaintiff signed acknowledgment of receipt of handbooks stating disclaimer of employment contract).

---

10. In *Anglemyer*, the Tenth Circuit noted that its research revealed only two Kansas cases which disposed of an implied contract claim on summary judgment. 58 F.3d at 537 (citing *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 872 P.2d 252 (1994) and *Kastner v. Blue Cross & Blue Shield of Kan., Inc.*, 21 Kan.App.2d 16, 894 P.2d 909 (1995)). The court further noted, however, that the federal

courts have been more willing to grant summary judgment in favor of employers when applying Kansas law. *Id.* (citing *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131 (10th Cir.1994), *Bullock v. Dillard Dep't Stores, Inc.*, No. 91–2474–O, 1992 WL 350229 (D.Kan. Oct. 20, 1992) (unpublished); and *Jonker v. Melvin Simon & Assoc.*, No. 86–1654, 1989 WL 31402 (D.Kan.1989) (unpublished)).

■■ A disclaimer in an employment manual does not as a matter of law determine whether a contract exists. *Morriss,* 241 Kan. at 514, 738 P.2d 841; *see also Rice v. Wal–Mart Stores, Inc.,* 12 F.Supp.2d 1207, 1214 (D.Kan.1998) ("A disclaimer included in a manual, however, does not necessarily determine whether an implied contract exists, especially in light of contradictory terms in the manual and statements by the employer's representatives."). In *Morriss,* the court held that a disclaimer did not preclude the formation of an implied employment contract because the defendant had not established: (1) that the disclaimer had been brought to the personal attention of the plaintiff; and (2) that the disclaimer was intended by the defendant to create an unqualified employment-at-will relationship. *Morriss,* 241 Kan. at 514, 738 P.2d 841.

> These two inquiries go directly to the heart of the issue—the intent of the parties. An unequivocal statement of intent to create an unqualified employment-at-will relationship removes any ambiguity regarding the intent of the employer. In addition, the act of bringing a disclaimer to the personal attention of an employee obviates any legitimate expectation on the part of the employee that an employment contract be formed.

*Bullock v. Dillard Dep't Stores, Inc.,* No. 91–2474–O, 1992 WL 350229, at *2 (D.Kan. Oct. 20, 1992).

■ Wal–Mart claims Davis's contract claim fails for three reasons. First, Wal–Mart argues Davis has expressly admitted that she was employed at-will at the time she was hired and at the time Wal–Mart terminated her. Second, even if a contract existed between the parties, Davis admits she did not fulfill her obligations under the contract. Thus, there could be no breach by Wal–Mart. Finally, Wal–Mart claims Davis was looking for another job while she was allegedly on leave. Therefore, it claims that even if she had a contract, she suffered no loss by her termination.

The court finds that Davis's employment application precludes the formation of a contract. The court is cognizant that as a matter of law such disclaimers do not determine whether a contract exists. However, Wal–Mart presented evidence of the two elements set forth in *Morriss:* (1) the disclaimer was brought to Davis's personal attention because she initialed beside the disclaimer and signed her name below it, *see Davis v. Lumacorp, Inc.,* 992 F.Supp. 1250, 1254 (D.Kan.1998) (finding that it was reasonable to assume the disclaimer was brought to the employee's personal attention because the employee had signed immediately below the disclaimer); *Bullock,* 1992 WL 350229, at *3 ("This certification succeeds where the Morriss disclaimer failed—it was called to Bullock's personal attention. It is reasonable to assume and plaintiff does not dispute that the certification was brought to her personal attention because she signed it."); and (2) the disclaimer was intended by Wal–Mart to create an unqualified employment-at-will relationship by stating: "I [the applicant] understand that this application is not a contract, offer, or promise of employment and that if hired I will be able to resign at any time for any reason. Likewise, the company can terminate my employment at any time with or without cause."

Davis claims *Rice v. Wal–Mart Stores, Inc.,* 12 F.Supp.2d 1207 (D.Kan.1998) precludes summary judgment in this case. In *Rice,* the plaintiff signed the same acknowledgment that Davis signed on her application for employment. During Rice's orientation, a Wal–Mart representative allegedly told her that her employment would be long term and that she would be terminated only for cause. Wal–Mart eventually terminated Rice for excessive absences after she began experiencing problems with her arms and shoulders and missed more than forty unscheduled hours over a two-month period. In her lawsuit against Wal–Mart, Rice claimed Wal–Mart breached an implied contract of employment prohibiting termination except for

cause. Wal–Mart argued only that the disclaimers precluded the contract. The court denied summary judgment finding that Rice had come forth with various statements found in the employee manual and made by Wal–Mart representatives regarding absences. Furthermore, the court relied on Wal–Mart's alleged representation that she would not be terminated except for cause.

*Rice* can be distinguished from this case in several respects. First, unlike the defendant in *Rice*, the defendant here does not depend solely on the disclaimers to support its position. Davis also has admitted she was employed at-will both at the time she was hired and at the time she was terminated. Second, the only representations Davis relies on are those Spurrier allegedly made to Dr. White stating she would continue to have her job once she recovered from her illness. However, Davis never contends any such statements were made to her. Davis also claims Thomas and Brahan, her immediate supervisors, told her to hurry and get back to work. This statement does not imply Wal–Mart would hold her job open indefinitely. In addition, Davis has not submitted any evidence that suggests Thomas or Brahan had any authority to make employment decisions on Wal–Mart's behalf.

■ Even if an employment contract did exist, Davis would have been bound by that contract's terms. However, she did not specifically request a leave of absence, and she did not keep Wal–Mart informed of the status of her condition. Furthermore, she failed to submit a health care provider certification that stated the day her leave would commence, the nature of her condition, her anticipated return to work date, and the duration and description of her condition, all of which were required under Wal–Mart's leave of absence policy. Instead, Davis argues she thought she fulfilled her obligation under the leave policy when she submitted the October 29, 1997 note from her doctor excusing her until further notice. However, Davis fails to point to any provision in

the employee handbook, benefits book, or leave of absence packet that would provide a basis for her belief. Therefore, because Davis failed to comply with Wal–Mart's leave of absence policy, she was not entitled to the benefits it provided.

In summary, the defendants' motion for summary judgment on Davis's contract claim is granted. The court finds no implied contract existed between Davis and Wal–Mart. The relationship between the parties was clearly an at-will situation as evidenced by Davis's acknowledgment of Wal–Mart's disclaimer and the unambiguous language of the disclaimer stating Wal–Mart's intent to form an at-will relationship. Furthermore, even if a contract existed between the parties, Davis breached that contract by failing to abide by its terms. Therefore, Wal–Mart did not breach the contract by terminating Davis.

## B. Claim for Benefits under the Plan

■ An hourly/full-time Wal–Mart employee is eligible for coverage under the Plan after ninety days of continuous full-time employment. An employee's coverage ends upon termination, "i.e., the last day worked—clocked in." Associate Benefits Book ("ABB") at C7. The Plan pays for a wide variety of covered hospital and other medical charges incurred because of sickness or accidental injury. Certain charges, such as those for pre-existing conditions, are not covered by the Plan. The Plan's policy regarding pre-existing conditions is as follows:

Any charge with respect to any participant for any illness, injury, or symptom (including secondary conditions and complications) which was medically documented as existing, or for which medical treatment, medical service, prescriptions, or other medical expense was incurred within 12 months preceding the effective date of these benefits as to that participant, shall be considered pre-existing and shall not be eligible for benefits under this Medical Coverage, until the participant has

been continuously covered under this Medical Coverage 12 consecutive months. (Pre-existing conditions include any diagnosed or undiagnosed condition.)

ABB at D11.

Plan participants receive a written notice if their claims for benefits are partially or fully denied, or if payment is withheld. If a participant receives a notice denying his or her claims, he or she may request a review by the Plan Administrator. The participant's request must be in writing and must contain any additional information the participant wishes the Plan Administrator to consider. The Plan Administrator promptly conducts a review and issues a written notice of the decision to the claimant within sixty days [11] following the receipt of the request. The Plan's administrative review process does not eliminate a participant's right to initiate legal action. However, before a participant initiates legal action he or she must pursue the review process.

The Plan pays for all health benefits. Wal–Mart funds are not used to pay the benefits. The Plan paid approximately $630 million in benefits in 1997, and Davis's claim was approximately $20,-000.00. The Plan initially rejected her medical bills for her treatment in October, November, and December 1997. Davis submitted an appeal, and the Plan issued a letter dated January 12, 1999, accepting the bills. Because the Plan has paid Davis's medical expenses, the only remaining issue on Davis's first claim is whether she is entitled to attorney's fees as a prevailing party.

Davis's claim for attorney's fees is brought against the Plan only. She seeks an order under 29 U.S.C. § 1132(g) for attorney's fees she incurred in prosecuting her claim for benefits under ERISA § 502(1)(b).

While employed at Wal–Mart, Davis was enrolled in the Plan. The effective date of her coverage was May 6, 1997. Her health care providers submitted bills in excess of $20,000.00 to the Plan for treatment Davis received in October, November and December 1997. On February 3, 1998, and subsequent dates, the Plan sent Davis notices that the charges for her surgery and treatment in October, November and December 1997 would not be paid because, according to the Plan, the charges were incurred for conditions that were "preexisting" within the meaning of the Plan. According to Andrea Lawrence, an Appeals Coordinator for the Plan, the Plan requests information to determine whether a claim is preexisting whenever participants of the Plan seek benefits during the first six months of their coverage. Lawrence Aff. at ¶ 3.

When Davis received notice that the Plan was not going to pay her bills, she made a written appeal to Wal–Mart. The Plan received the handwritten appeal and stamped it "February 18, 1998, APPEALS." Andrea Lawrence was the Appeals Coordinator who handled Davis's appeal of the denial of her benefits. When Lawrence received Davis's appeal, she sent a letter to Davis dated March 10, 1998, thanking her for her appeal and telling her the Plan would request medical documents from various providers and that the process could take six weeks or more. Lawrence also sent Davis a release and asked Davis to sign it and return it to her. Davis did not return the release to Lawrence. In any event, Lawrence attempted to proceed with the appeal. She sent a request for medical records with an old release signed by Davis on December 17, 1997, to Via Christi St. Francis Hospital and Columbia Wesley Medical Center, the hospitals at which Davis received treatment.

Columbia Wesley Medical Center refused to produce the medical records because the release Lawrence submitted had

11. An extension of up to an additional sixty days may be required if special circumstances exist.

not been signed within sixty days. Because Lawrence had not received new releases from Davis, on May 8, 1998, she sent a letter to Davis explaining that the Plan had not been able to process her appeal because the hospital and medical center would not produce the medial records without a current release. Along with the letter, Lawrence enclosed another release and asked Davis to return it directly to her so that she could process the appeal. She also provided Davis her direct dial number so that Davis could contact her with any questions.

Lawrence still had not received a release from Davis or heard from her following the May 8, 1998 correspondence. Therefore, on June 16, 1998, Lawrence wrote to update Davis on the status of her appeal. She advised Davis that the Plan could not process her appeal until it had the medical records and needed her current release in order to proceed. She further informed Davis that the Plan had no choice but to close her case until it received the records and that it would re-open the case as soon as it did. Lawrence heard nothing more about the matter until November 1998 at which time she learned that Davis had filed a lawsuit concerning her benefits claim but had agreed to exhaust her administrative remedies. At that time, Lawrence requested the medical records from Davis's attorney and he provided a court order that enabled the Plan to get the records. Lawrence then requested a medical opinion from Dr. McKnight as to whether Davis's condition was pre-existing. He concluded that the condition was not pre-existing.

After Davis submitted her handwritten appeal in February of 1998, her attorneys sent a written demand addressed both to Wal–Mart in Bentonville, Arkansas and to

the Plan Appeals Department in Rogers, Arkansas on March 5, 1998.[12] The Plan received this letter and stamped it "Mar 10, 1998, APPEALS." On March 31, 1998, Kirk Guthrie, a paralegal in the Wal–Mart legal department, sent a letter to Davis's counsel, informing them that Wal–Mart was in the process of gathering additional information regarding Davis's appeal and that they would be forming their response to the matter as soon as possible. On May 26, 1998, Davis's attorneys sent another letter to Guthrie. The defendants never responded to this letter.[13]

Davis commenced this lawsuit on June 12, 1998. On September 10, 1998, the court incorporated into the case scheduling order the parties' agreement for Davis to voluntarily submit her claim for benefits to the Plan Administrative Committee on or before October 31, 1998. On October 31, 1998, Davis's attorneys submitted an administrative appeal. On January 12, 1999, the Plan's Administrative Committee issued a decision approving payment of the medical charges previously denied on the basis of a "pre-existing condition." The Plan subsequently has paid all sums owed on behalf of Davis for her medical claims.

The Plan claims the opinion of Dr. McKnight and the medical records caused the Administrative Committee to reverse the decision denying medical benefits. According to the Plan, Davis's lawsuit had absolutely no bearing on the Administrative Committee's decision to grant benefits. It claims it does not settle benefit claims which have been denied. The only way such benefit claims are paid as a matter of policy, is if the court concluded the Plan abused its discretion and enters judgment directing payment.

**12.** Lawrence's first response to Davis was dated March 10, 1998.

**13.** The Plan claims that although Davis's attorney had sent a demand letter to Wal–Mart's legal counsel who was handling the wrongful termination claim in May 1998 before filing suit, the letter was not sent to the Plan nor did it reference Davis's benefit claim, other than in the context of wrongful termination. The Plan claims that it indeed was corresponding with Davis to request medical releases before her attorney sent the letter in May 1998, and this is supported by the letters Lawrence sent to Davis.

Under 29 U.S.C. § 1132(g), a district court "in its discretion may allow a reasonable attorney's fee and costs of action to either party." Although the statute is not clear on this point, most courts, including the Tenth Circuit, have interpreted ERISA to allow an award of attorney's fees only to prevailing parties. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 89 n. 14, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982); *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1210 (4th Cir.) (review of cases), cert. denied, 522 U.S. 1029, 118 S.Ct. 629, 139 L.Ed.2d 609 (1997); *Arfsten v. Frontier Airlines, Inc. Retirement Plan for Pilots*, 967 F.2d 438, 442 n. 3 (10th Cir.1992). Courts should not grant attorney's fees under ERISA "as a 'matter of course.'" *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1209 (10th Cir.1992) (citation omitted).

Because this claim was disposed of without full litigation on the merits, the burden is on Davis to show that her suit was a "catalyst" or "material factor" in obtaining benefits from the Plan and that the Plan did not act for "wholly gratuitous" reasons in response to her suit. *Phelps v. U.S. West, Inc.*, No. 97–1270, 1998 WL 165117, at *3 (10th Cir. Apr. 3, 1998) (unpublished opinion) (citing *Hooper v. Demco, Inc.*, 37 F.3d 287, 292 (7th Cir. 1994)).

In *Phelps*, the Tenth Circuit upheld the district court's decision to deny attorney's fees under 29 U.S.C. § 1132(g). *Phelps*, 1998 WL 165117, at *3. Phelps was the former Executive Director of U.S. West Human Resources. *Id.* at *1. When he retired he, along with approximately 30,-000 other retirees, were entitled to lifetime health benefits. *Id.* Five years after Phelps retired, U.S. West indicated it was amending its plan in such a way that it might not continue the benefits indefinitely as it had promised. *Id.* Phelps filed an administrative claim requiring that the benefits plan be amended to specifically state that it guaranteed benefits for lifetime. *Id.* Before he received a response to his administrative claim, Phelps filed a federal class action suit against U.S. West. *Id.* The plan denied his claim but reassured him that it intended to amend the plan to continue its commitment to Phelps and the other eligible retirees. *Id.* Nonetheless, Phelps continued his lawsuit because the amendment had language that suggested benefits would be frozen indefinitely at 1996 levels. *Id.* at *2. During a deposition, U.S. West indicated it would not freeze benefits at the 1996 levels, and the parties ultimately dismissed the lawsuit by stipulation. *Id.*

The Magistrate rejected Phelps's request for attorney's fees, and the district court, as well as the Tenth Circuit, affirmed that decision. *Id.* at *3. The Tenth Circuit found Phelps failed to carry his burden of establishing that his lawsuit was a catalyst for obtaining the amendment. *Id.* Although Phelps presented an affidavit of a member of the Retiree Advisory Board that stated his lawsuit caused the amendment, the court found the contradictory affidavits of U.S. West to be equally convincing. *Id.* The court ultimately found that Phelps did not cause U.S. West to amend its plan and thus was not the prevailing party in the litigation. *Id.*

Under the criteria set forth in *Phelps*, the court finds that Davis does not qualify as a prevailing party. The circumstances in *Phelps* presented a much stronger argument for awarding attorney's fees than those presented in this case, but the Tenth Circuit declined to award attorney's fees in that case. In *Phelps*, the amendment to the plan came only after Phelps filed his lawsuit. The evidence in this case does not suggest Davis's lawsuit was a "catalyst" or "material factor" in obtaining payment from the Plan. The evidence clearly shows the Plan was attempting to process Davis's appeal long before she filed her lawsuit. Had Davis provided the necessary release, the appeal likely would have proceeded and she would have been paid, just as she was after she filed the lawsuit. In other words, Davis cannot show that

"but for" her lawsuit her claims would not have been paid. Davis has established that the Plan did not act for "wholly gratuitous" reasons in paying her benefits. However, she has not shown that the Plan paid her benefits based solely on the strength of her case. *See Hooper*, 37 F.3d at 293 (finding that the lawsuit must have prompted the settling party "to act or cease its behavior based on the strength of the case, not 'wholly gratuitously' in response to the plaintiff's claims.") (citation omitted). The Plan paid her benefits, not out of sympathy or charity, but because she was entitled to payment because her condition was not "pre-existing" within the meaning of the plan. It seems likely the Plan would have paid her benefits whether she filed the lawsuit or not, provided she fully cooperated in her appeal.

In addition, the court is not satisfied that the resolution of Davis's claim constitutes a "settlement." Davis argues that in essence the Plan's decision to reverse its prior decision and pay the medical bills has the same effect as a settlement of the benefits claim. However, this situation is not like a typical settlement where the parties compromise a disputed claim. Here, Davis submitted claims that represented a certain amount to be paid. Once the Plan obtained the necessary information to process her appeal, it paid her the amount she sought.

 Even if Davis could establish prevailing party status, the court must consider several other factors to determine whether an award of attorney's fees is justified:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all par-

ticipants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *Gordon v. United States Steel Corp.*, 724 F.2d 106, 109 (10th Cir.1983). "[T]he five *Gordon* factors are merely guidelines, and while courts need not consider each factor, no single factor should be held dispositive." *McGee*, 953 F.2d at 1209 n. 17.

Even if Davis is considered the prevailing party, the *Gordon* factors do not weigh in favor of granting her attorney's fees and costs. First, the Plan did not act in bad faith. It denied Davis's benefits because it determined the charges for which she sought reimbursement were incurred for a "pre-existing" condition. Davis contends the Plan acted in bad faith because it routinely denies benefits for charges that occur within six months of a participant being eligible for benefits. However, the evidence before the court does not suggest that is necessarily the Plan's standard procedure. Lawrence's affidavit states that the Plan usually requests additional information whenever participants seek benefits during the first six months of their coverage. She did not state that the Plan routinely rejects the claims; it only seeks further information.

In addition, the Plan's initial rejection of Davis's claim was not necessarily unreasonable, considering the effective date of her coverage was May 6, 1997, and she started seeking medical treatment on May 14, 1997.[14] Furthermore, the evidence clearly indicates the Plan was working on Davis's appeal long before she filed her lawsuit. Davis was the one who was not cooperating. She never submitted the required medical release so that the Plan could process her appeal. Lawrence requested the releases on several occasions to no avail. She even attempted to obtain the medical records using an outdated release Davis had signed, but the hospitals

---

**14.** It is not clear from the record whether the treatment Davis received in May was in any way related to the medical condition for which she sought treatment in October, November, and December 1997.

refused to release the information based on the old releases. Furthermore, the record indicates that the circumstances surrounding Davis's appeal were replete with miscommunications. By the time Davis's attorneys became involved, she had already started the appeals process. Therefore, the appeals coordinator, Lawrence, sent correspondence directly to Davis. It appears Davis was not sharing this information with her attorneys. In addition, it is not clear whether her attorney's correspondence was addressed to the appropriate department. Once Davis released her medical records, the Plan paid her claims within a short time.

The second *Gordon* factor weighs in Davis's favor. It appears the Plan has adequate resources to satisfy an award of attorney's fees. The Plan, however, argues that if it were ordered to pay the fees, such an award would "harm the participants and beneficiaries of the Plan since it would reduce the assets available to pay benefits." Def.Mem. at 10. The court rejects the Plan's argument and finds that it would have sufficient funds to satisfy any award for attorney's fees. Third, an award of attorney's fees would not have a deterrent effect in this case. The evidence contained in the record suggests the Plan would have timely processed Davis's appeal had she cooperated by signing a new medical release. This case does not involve any actions that need to be deterred in the future. Fourth, Davis concedes she did not attempt to benefit all of the participants of the Plan. Finally, both parties had reasonable arguments concerning the payment of benefits. Once Davis's claims were denied, she sought an appeal of that decision. The Plan did not immediately pay the benefits, but instead required that the claim be processed through the appropriate administrative process, which required Davis to sign a medical release to obtain the pertinent records. Without the appropriate release, the Plan was unable to pursue Davis's appeal. Once the required release was obtained, the Plan processed the appeal and ultimately paid Davis's claim.

The Plan claims, and the court is persuaded, that it paid the claims based on Davis's medical records and Dr. McKnight's opinion, not because Davis filed a lawsuit against it.

In conclusion, Davis's motion for partial summary judgment on her claim for attorney's fees is denied because (1) she is not a prevailing party; and (2) the *Gordon* factors do not weigh in favor of awarding attorney's fees.